**STATE of Missouri, Respondent,**

v.

**Robert Eugene SINDERSON, Appellant.**

No. 54691.

Supreme Court of Missouri,
Division No. 2.

June 8, 1970.

Motion for Rehearing or to Transfer to Court
En Banc Denied July 13, 1970.

John C. Danforth, Atty. Gen., Jefferson City, for respondent.

George M. Flanigan, Gene C. Thompson, Carthage, for defendant-appellant.

FINCH, Judge.

Defendant was convicted of first degree robbery and sentenced to imprisonment for five years. This is an appeal therefrom. We affirm.

During the early morning hours of March 3, 1967, one Merrill Nichols, who operated a place of business in Joplin called "The Cold Spot," was robbed of $65.00 and in the course of the incident Mr. Nichols was shot and killed.

On March 7, 1967, a petition was filed in the Juvenile Court of Jasper County charging defendant with killing Merrill Nichols. At that time, defendant was a little over 14 years old, having been born December 21, 1952. Accordingly, he was subject to the provisions of Chapter 211,[1] the Juvenile Code. Following a hearing, the Juvenile Court on April 17, 1967, determined that the defendant, Robert Sinderson, was not a proper subject to be dealt with under the Juvenile Code and that he should be prosecuted under the general law. Defendant then was charged in the Circuit Court with first degree murder. Subsequently, he was tried on that charge but the trial resulted in a hung jury. Thereafter, a grand jury indicted defendant on a charge of robbery in the first degree. This matter was referred by the Circuit Court to the Juvenile Court, which found that Merrill Nichols had been killed during an armed robbery, that the defendant had furnished the weapon and was involved in the robbery, that defendant was not a proper subject to be dealt with under the Juvenile Code, and that he should be prosecuted under the general law. After an information in lieu of the indictment was filed, defendant was tried and convicted on the first degree robbery charge, from which he now appeals. Defendant never has been retried on the murder charge.

All questions raised on this appeal relate to a written statement taken from defendant on March 6, 1967, which was received in evidence over defendant's objection. The points raised are that the defendant's statement was made inadmissible by provisions of Chapter 211 (the Juvenile Code), by considerations of fundamental fairness, and by certain state and federal constitutional provisions. We summarize the evidence only to the extent necessary to decide the issues raised.

Defendant lived with his mother and stepfather in Saginaw, Missouri, a small community adjacent to Joplin. Sometime during the early morning hours of March 3, 1967 (after the incident at The Cold Spot), defendant departed from Joplin by bus. He went to St. Louis and during the afternoon went to Lambert Field in St. Louis County, where an uncle, Frank Sinderson, was employed. He told Mr. Sinderson that he had run away from home because he was having trouble with his stepfather, but said nothing about a robbery or a shooting in Joplin. He went home with his uncle that

---

1. All statutory references are to RSMo 1959, V.A.M.S., unless otherwise indicated.

evening and spent the weekend at his home in St. Charles, Missouri. On Monday morning, Mr. Sinderson went to see the juvenile authorities at St. Charles to inform them of defendant's whereabouts if anybody should be looking for him. Mr. Sinderson then called defendant's mother, Mrs. Waddle, to tell her that defendant was with him. In that conversation Mrs. Waddle told Sinderson of The Cold Spot robbery and homicide. As a result of that conversation, Mr. Sinderson then called Denzil Albin, the Jasper County Juvenile Officer, at Joplin, and thereafter Mr. Sinderson and the defendant left St. Charles to drive to Joplin. On arrival, they first went to the defendant's home in Saginaw. They stayed there thirty to forty minutes, after which the defendant, his mother and his uncle drove to the Joplin Police Station.

Upon entering the station, Mr. Sinderson asked for Denzil Albin, the Juvenile Officer to whom he had talked that morning. Mr. Albin was not there, but Jack Fay, the Joplin Municipal Juvenile Officer, was present and he notified Albin of their arrival. Shortly, Mr. Albin arrived, after which defendant, his mother and his uncle were ushered into the office of Captain Flenner of the Joplin Police Department, where Captain Flenner, Mr. Albin, Mr. Fay and Officer Harold Abben were present.

Mr. Albin started by telling the defendant that the officers wanted to talk to him about some matters. He stated that according to defendant's mother, he had run away from home. Meanwhile, a gun had been found at the bus station which apparently belonged to the defendant or some member of his family. The officers wanted to talk to him about how the gun got to the bus station, what connection he had with the gun and matters pertaining to the gun. Albin went on to tell defendant that he had certain constitutional rights and read and explained to him a printed form entitled "Your Rights" (State's Exhibit 22).[2] Captain

2. That form, together with the signatures thereon, was as follows:

"YOUR RIGHTS

Place   Joplin Police Department

Date   3-6-67

Time   5:55 p. m.

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

"WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed   Bob Sinderson

Witness   Mrs. Darlene Waddle—W. H. Flenner

Witness   Frank D. Sinderson—Denzil Albin

Time   6 p. m. 3/6/67"

Flenner then also read the statement to defendant and explained it. The defendant, his mother and his uncle, Frank Sinderson, then were asked if they had any questions about Exhibit 22, and they stated that they did not and that they understood those rights. Bobby, the defendant, stated that he didn't want an attorney, and his mother said she did not see the need for an attorney. Thereupon, Bobby signed Exhibit 22 and his signature was witnessed by Captain Flenner, Denzil Albin, Mrs. Waddle and Frank Sinderson.

The interrogation started around 6:00 p. m., with perhaps as much as two-thirds of the interrogation being by Captain Flenner and the remainder by Denzil Albin. At no time did Mr. Albin interview or interrogate defendant outside the presence of the police officers. Mrs. Waddle and Mr. Sinderson were in the room when the interrogation started and it was made clear to them that they had the right to sit in during the questioning. After a short time, Mrs. Waddle and Mr. Sinderson left the room, but they never left the Police Station, and Mrs. Waddle was back in the room from time to time during the evening and, according to Denzil Albin, was there for quite some period of time. Several times she urged Bobby to eat some food. Food also was offered to defendant by Denzil Albin and by Captain Flenner, but defendant refused, saying he was not hungry. Defendant was permitted to use the rest room and did so. The interrogation continued, with short interruptions, until about 10:25 p. m., when the officers started to reduce defendant's statement to written form. After the statement was typed, copies were given to defendant, his mother and his uncle, Frank Sinderson, and they followed along as the statement was read to Bobby. Eleven corrections were made in the statement at his request and he initialed those changes. He then signed the statement, which was witnessed by Captain Flenner, Mrs. Waddle and Denzil Albin.

The trial court conducted a hearing outside the presence of the jury on the voluntariness and admissibility of defendant's statement. After the conclusion of that testimony, the court made an order holding the statement to be voluntary and admissible in evidence. That order included the following language:

"Now, at this time comes on to be determined the admissibility of the statement made by Robert Eugene Sinderson. The Court finds that when the defendant, Robert Eugene Sinderson voluntarily went to the Joplin Police Department, he was promptly delivered to the officers of the Juvenile Division of the Circuit Court of Jasper County, Missouri, and his mother accompanied him to the police station, in the company of his paternal uncle, Frank Sinderson. All of these people were never excluded from the examination and remained until it was completed and the statement signed. The defendant was informed that he was being held for investigation in connection with the murder of Merrill Nichols, which took place on March 3, 1967, and which also involved the robbery of the Cold Spot grocery at Tenth and Moffett Avenue in the City of Joplin, Jasper County, Missouri.

"That before any statement was made by the defendant and before he was questioned in connection with the above offense, he was advised (1) That he had a right to remain silent at all times; (2) That any statement he made might be used against him; (3) That he had a right to have an attorney present, and if he was unable to employ an attorney, one would be appointed to represent him; and that he did not have to answer any questions outside of the presence of an attorney. That if he required an attorney, an attorney would be provided for him even though he did not have the money to employ him.

"The Court finds that the statements in question were voluntarily made by the defendant; that his mother was present at the time such statements were made. That Denzil Albin, the duly appointed and acting Juvenile Officer of Jasper County, Mis-

souri, was present at the time such statements were made. That the statements were not procured by coercion or threats, either physical or mental, and through fear, and were not induced by promises of leniency or reward of any kind for making such statements. That the defendant intelligently waived his constitutional rights and his right to have an attorney present, and voluntarily made such statements without any compelling influences; and considering the totality of the circumstances surrounding the questioning of the defendant, the defendant's statements were voluntarily made by the defendant, and therefore, the Court overrules the defendant's objection and admits the statement in evidence."

█ We consider first the contention that defendant's statement was inadmissible under provisions of the Juvenile Code. The particular sections with which we are concerned are §§ 211.061(1) and 211.271(3), which at that time provided as follows:

§ 211.061(1). "When a child is taken into custody with or without warrant for an offense, the child together with any information concerning him and the personal property found in his possession, shall be taken immediately and directly before the juvenile court or delivered to the juvenile officer or person acting for him."

§ 211.271(3). "Evidence given in cases under sections 211.011 to 211.431 is not lawful or proper evidence against the child for any purpose whatever in a civil, criminal or other proceeding except in subsequent cases under sections 211.011 to 211.431."

In reviewing the questions presented we must give consideration to a series of three cases in which these two sections have been considered and interpreted. The cases involved a 15-year-old juvenile named Arbeiter who was arrested by the police in connection with a homicide and was interrogated before he was turned over to the Juvenile Court or Juvenile · Officer as required by § 211.061(1). After a written confession was obtained from him, Arbeiter was delivered to the custody of the Juvenile

authorities. Subsequently, the Juvenile Officer talked to him and in answer to the officer's questioning, Arbeiter confessed the killing. In State v. Arbeiter, Mo., 408 S.W. 2d 26, hereinafter referred to as Arbeiter (1), a conviction for first degree murder was reversed and the case remanded because the statement taken by the police was held to be inadmissible for failure to comply with § 211.061(1). What we shall refer to as Arbeiter (2) (State ex rel. Arbeiter v. Reagan, Mo., 427 S.W.2d 371) was a prohibition proceeding involving the right of the Circuit Court to issue a subpoena duces tecum at the request of the Circuit Attorney for the production of certain juvenile records concerning statements Arbeiter might have made. Arbeiter (3) (State v. Arbeiter, Mo., 449 S.W.2d 627) involved an appeal from a conviction on retrial of murder in the second degree. In that case the court held inadmissible the oral statements made by Arbeiter to the Juvenile Officer without any warning as to the consequences thereof. The court held the statement inadmissible under § 211.271 (3), saying, 1. c. 633, that to hold otherwise "would permit the juvenile officer to procure the admission of the juvenile in the relaxed, nonadversary atmosphere of the juvenile interrogation and make the statement admissible in subsequent criminal proceedings."

We conclude that no violation of § 211.-061(1) has been shown in this case. Bobby Sinderson was not picked up by the police officers. He was brought to the Joplin Police Department by his mother and uncle, pursuant to arrangements made by the uncle with the Juvenile Officer. When they arrived at the station, they asked for Mr. Albin and there was no attempt to interrogate the defendant until Albin was called and had come to the station himself. The interrogation of defendant by Captain Flenner was in the presence of Mr. Albin, who also participated in the questioning. This interrogation was arranged by the Juvenile Officer and was not in violation of § 211.061(1). The court in Arbeiter (1)

expressly recognized that it was not ruling upon a situation where no violation of § 211.061(1) was shown, when it stated, 408 S.W.2d l. c. 31: "We are, of course, determining only the question here presented. We do not consider the question of spontaneous statements by a juvenile prior to being taken before the juvenile judge or juvenile officer; *nor do we consider statements of a juvenile in response to questioning after § 211.061 has been complied with.*" (Emphasis supplied.) Accordingly, Arbeiter (1) does not govern this case.

■ Defendant next asserts that his statement was inadmissible under the provisions of § 211.271(3). We note first that it is not made so by Arbeiter (1) because, as noted above, in that case the statement under question was excluded for violation of § 211.061(1), not on the basis of § 211.-271(3). Furthermore, the court in that opinion said, 408 S.W.2d 29: "We reject appellant's contention that subsection 3 of § 211.271, by its terms, renders inadmissible statements resulting from police questioning from the moment that a child is taken into custody. The prohibition of that section is against the use of evidence given in juvenile court *cases* against the child in criminal proceedings. The statements here in question were not 'evidence given' in a juvenile court case."

Defendant's statement obviously is not made inadmissible by Arbeiter (2) because that case did not pass upon any question of admissibility. Neither is defendant's statement made inadmissible by the ruling in Arbeiter (3). The latter case considered only the admissibility of a statement given by the juvenile to the Juvenile Officer without any warning of consequences and at a time when the officer was talking "in the relaxed, nonadversary atmosphere of the juvenile interrogation." The fact that Arbeiter (3) did not rule the question here involved is also made clear in the opinion when it discusses Arbeiter (2) and in that connection states, 449 S.W.2d l. c. 633: "The court in Reagan [State ex rel.

Arbeiter v. Reagan, 427 S.W.2d 371] specifically declined to pass upon the admissibility into evidence of any statements which might be found in the juvenile court files. The concurring opinion of Judge Finch, in which two judges concurred, did intimate that if constitutional standards were met, the Juvenile Code would not preclude the introduction into evidence at the criminal trial of a confession of the juvenile, although evidence of such confession might have also been presented to the juvenile court. Since admittedly appellant here was not advised in any manner of the consequences of his statements, the situation suggested by Judge Finch does not exist here and we need not consider that possibility."

We now have before us for consideration in the instant case the situation which Judge Welborn in Arbeiter (3) recognized was not there present, namely, a situation in which the juvenile was given a warning meeting constitutional standards. Here, both the Juvenile Officer and the police captain advised the defendant of his constitutional rights and explained them. The defendant, his mother and his uncle were given a chance to ask any questions or to express any doubts as to those rights. They had no questions and said that they understood his rights. Both defendant and his mother stated that they did not consider it necessary to have an attorney present. The warning which was given complies with the decision of the United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Defendant complains that he was not informed as to the punishment possible for murder or first degree robbery, but we do not understand Miranda (or any other case) to so require. The trial court took testimony and found that the statement was voluntarily and knowingly given. The evidence shows that the setting in which defendant gave his statement was not a relaxed, nonadversary, *parens patriae* situation, as in Arbeiter (3). Rather, he was warned as to the consequences of making a statement. He was

in the police station and a police captain was participating actively. Under this set of facts, we hold that the statement was not made inadmissible by § 211.271(3) as it existed at the time the statement was taken and when the defendant was tried.

■ Defendant calls attention to the fact that in 1969 the general assembly amended § 211.271(3) so as to include language providing that, "After a child is taken into custody as provided in section 211.131, all admissions, confessions, and statements by the child to the juvenile officer and juvenile court personnel * * * are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, other than proceedings under this chapter."[3] That amendment became effective October 13, 1969, which was after defendant's trial was held. Nevertheless, it is defendant's contention that this legislative action represented merely a clarification of existing statutory language and did not bring about any change in the meaning of the statute. Accordingly, says defendant, his statement was inadmissible except in a proceeding under the Juvenile Code. We are not called upon in this case to construe the language of the amended section or to determine its meaning in a case to which it applies, but we reject the contention that it represented merely a clarification or restatement of a previously existing provision. Accordingly, we hold that its enactment had no effect on the admissibility of defendant's statement in his trial which we now review.

■ Defendant further urges that even in the absence of any specific statutory exclusions in the Juvenile Code, a statement taken while defendant was under the exclusive jurisdiction of the Juvenile Court should be excluded because to hold otherwise would be fundamentally unfair. In support of that thesis defendant cites several cases, particularly Harling v. United States, 111 U.S.App.D.C. 174, 295 F.2d 161, and

State v. Maloney, 102 Ariz. 495, 433 P.2d 625. Both of these cases were discussed in Arbeiter (3) but there the court stated, 449 S.W.2d 1. c. 632, that "the fundamental question presented here is not whether we should accept Harling, but is whether our statute has, in effect, prescribed a rule similar to that laid down in Harling." The court in Arbeiter (3) did not purport to adopt an absolute bar (as in Harling and Maloney) to any statement made by a juvenile while within the exclusive jurisdiction of the Juvenile Court. We conclude now that we should not adopt such a rule. Rather, in the absence of any statute providing otherwise, we agree with the view expressed by the Supreme Court of Oregon in State v. Gullings, 244 Or. 173, 416 P.2d 311, 313, when it said: "Presuming that federal constitutional Fifth and Sixth Amendment rights are granted, we believe that an absolute prohibition is not required so long as it is made clear to the juvenile that criminal responsibility can result and that the questioning authorities are not operating as his friends but as his adversaries."

■ Finally, we consider defendant's assertion that under the "totality of circumstances" the taking of the statement from defendant violated Amendments V, VI and XIV to the Constitution of the United States, and §§ 10, 18(a) and 19 of Art. I of the Constitution of Missouri of 1945. The federal cases cited and relied upon by the defendant in this connection are Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325; Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84, and In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527.

In Gallegos the court reversed a conviction of a 14-year-old boy for first degree murder on the basis that under the "totality of circumstances" a confession given by defendant on which his conviction may have rested was obtained in violation of due process. In that case, according to

---

3. Laws of 1969, p. ——, H.B.No.375, § 1, Cum.Ann. Pocket Part, Vol. 12A, V.A.M.S.

the majority opinion, the defendant confessed after five days of interrogation, during which he had not seen a lawyer, parent or other friendly adult, although his mother had tried to see him during that period of time. In the course of the majority opinion the court says, 370 U.S. l. c. 54, 82 S.Ct. l. c. 1213: "A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a 14-year-old boy would not be able to know, let alone assert, such constitutional rights as he had."

We find no similarity between the "totality of circumstances" in Gallegos and the instant case. Here, defendant's mother and uncle were with him when his constitutional rights were explained and when he concluded to go ahead and talk to the officers without a lawyer being present. Both the mother and uncle remained at the Police Station during all of the period of interrogation and defendant's mother was in and out of the room on several occasions and was present for quite some period of time. Both the mother and uncle were present when the written statement was read to the defendant and he checked it and made corrections therein before signing it. The factual circumstances surrounding the action of the defendant in giving a statement differ materially from those in Gallegos.

Actually, defendant takes the position in his brief that a 14-year-old cannot waive appointment of counsel. His brief says: "How could this court or any court validly hold that a 14-year-old boy is capable of waiving such a precious right?" However, neither cases by the Supreme Court of the United States nor Missouri cases which defendant cites support that contention. As previously noted, the language of Gallegos above spoke alternatively of aid or advice of "a lawyer or an adult relative or friend".

Kent reversed an order of the Court of Appeals for the District of Columbia on the basis of a procedural error with respect to a waiver by the Juvenile Court of its jurisdiction without conducting a hearing thereon, although such a hearing was requested by counsel for the juvenile. The case was remanded for a hearing by the District Court on the issue of waiver. It does not require a holding that the taking of a statement from the defendant Sinderson without an attorney being present violated federally guaranteed constitutional rights so as to make the statement inadmissible in evidence.

In Gault a 15-year-old minor, after hearings before a Juvenile Court Judge, was committed to the State Industrial School as a delinquent until he should reach majority. In the course of its opinion the Supreme Court of the United States held that the due process clause of the Fourteenth Amendment required that in proceedings to determine delinquency which may result in commitment to an institution in which the juvenile will be incarcerated, the child and his parents must be notified of the right to be represented by counsel retained by them, and that if unable to afford counsel, an attorney will be appointed to represent the juvenile. At the hearing Mrs. Gault testified that she knew she could have appeared with counsel, but the court held that this was not an effective waiver of the right to counsel. The court, however, recognized that counsel could be waived when it said, 387 U.S. l. c. 42, 87 S.Ct. l. c. 1451: "They had a right expressly to be advised that they might retain counsel and to be confronted with the need for specific consideration of whether they did or did not choose to waive the right. If they were unable to afford to employ counsel, they were entitled in view of the seriousness of the charge and the potential commitment, to appointed counsel, unless they chose waiver. Mrs. Gault's knowledge that she could employ counsel was not an 'intentional relinquishment or abandonment' of a fully known right."

The court in Gault further recognized that a confession by a minor may be voluntary even though he was not represented by counsel at the time the confession was made when it said, 387 U.S. 1. c. 55, 87 S.Ct. 1. c. 1458: "We conclude that the constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults. We appreciate that special problems may arise with respect to waiver of the privilege by or on behalf of children, and that there may well be some differences in technique —but not in principle—depending upon the age of the child and the presence and competence of parents. The participation of counsel will, of course, assist the police, Juvenile Courts and appellate tribunals in administering the privilege. If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair."

Furthermore, we note that on April 27, 1970, in Hester v. Illinois, 397 U.S. 660, 90 S.Ct. 1408, 25 L.Ed.2d 642 the Supreme Court of the United States dismissed as improvidently granted the writ of certiorari which it previously had issued to the Supreme Court of Illinois in the case of People v. Hester, 39 Ill.2d 489, 237 N.E.2d 466. This action seems significant to us on the question of whether a 14-year-old can make a voluntary confession without counsel without violating constitutional rights. That case involved a 14-year-old defendant who was below normal intelligence. He was interviewed by police officers in the morning and denied complicity in the stabbing of one of the school teachers where he attended school. He was kept during that day at a juvenile detention center and when questioned again the latter part of the afternoon and confronted with results of analyses of his clothing by the crime laboratory, he confessed the killing. At the times when he was questioned and when he confessed, neither an attorney, his mother nor some adult relative or friend were present. The Supreme Court of Illinois affirmed a finding of the trial court that Hester's confession was voluntary. Such decision necessarily recognized that it is possible for a juvenile to make a voluntary confession without having counsel. That decision was left standing by the dismissal of the writ of certiorari.

We already have discussed the Arbeiter cases which defendant again cites in connection with the constitutional issue. None of them are authority for the proposition that a 14-year-old cannot constitutionally waive counsel and make a voluntary confession. Defendant cites a few decisions from other states but we will not extend this somewhat lengthy opinion by reviewing and analyzing them. We have considered them in reaching this decision.

We hold that no violation of federal or state constitutional rights of defendant has been shown.

Before ending this opinion we wish to state that our observation of the transcript, defendant's brief and oral argument on his behalf demonstrates to us that defendant has been represented by appointed counsel who have been highly competent and diligent. It is obvious that counsel have explored every facet of the case and have devoted an immense amount of time in the Juvenile Court, the Circuit Court and this Court. Such efforts are in the highest tradition of the legal profession and have aided this Court in its consideration of this appeal.

Judgment affirmed.

DONNELLY, P. J., MORGAN, J., and HENLEY, Alternate Judge, concur.