STATE of Missouri, Respondent,

v.

Herbert PIERCE, Appellant.

No. 69656.

Supreme Court of Missouri,
En Banc.

April 19, 1988.

William L. Webster, Atty. Gen. Jared R. Cone, Kurt A. Hentz, Asst. Attys. Gen., Jefferson City, for respondent.

ROBERTSON, Justice.

The State charged appellant, Herbert Dwayne Pierce with two counts of first-degree murder, one count of first-degree robbery and one count of first-degree burglary. A jury convicted appellant of first-degree robbery,[1] and first-degree burglary.[2] He was sentenced to thirty years and fifteen years, respectively, the sentences to run consecutively. The Court of Appeals, Eastern District, affirmed the conviction and sentence. We granted transfer to consider issues relating to the admissibility of confessions of juveniles made after the juvenile court has dismissed a juvenile petition and transferred the matter to a court of general jurisdiction. Section 211.071(1), RSMo 1986. We have jurisdiction. Mo. Const. art. V., § 10. Reversed and remanded.

I.

Near midnight on October 7, 1984, St. Louis police were summoned to investigate an assault at the residence of two elderly sisters, Ruthie and Faustina Brown. Upon arrival, the first responding officer was met by two young men, Michael Sturghill and Donald Steward, who informed him that a burglary and assault had occurred upstairs. The officer entered the building through an open basement door and proceeded up two flights of stairs to a double French door with glass panes in it. A large number of panes had been broken out and blood was spattered on the wall directly behind the door. The officer then passed through the door into the living area and found the two sisters.

The apartment was ransacked. Ruthie Brown lay unconscious on her back in the living room. Faustina Brown was sitting near her sister in a chair, crying. At that time, Faustina was able to indicate to the officer only that she had been "roughed up" by intruders and her hip and back hurt.

Janis G. Good, St. Louis, for appellant.

1. Section 569.020, RSMo 1986.

2. Section 569.160, RSMo 1986.

Within a few minutes, paramedics arrived and pronounced Ruthie dead. Faustina was taken to a hospital by ambulance.

When they noticed that Steward was bleeding from a cut on his hand, the police suspected Steward and Sturghill might be involved in the crime. The two were transported to the police station for questioning. Their tennis shoes were confiscated to compare with footprints found on the broken door. When Sturghill removed his shoe, an officer found nearly $200 inside. Some of the bills were bloodstained; blood found in the apartment matched Steward's. Steward and Sturghill both made statements to the police. In his statement, Sturghill implicated the appellant, Herbert Pierce.

The following day, the police apprehended Pierce. Because he was fifteen years of age, Pierce was taken directly to the juvenile facility. A car was sent to pick up his mother. After appellant was advised of his *Miranda* rights by a juvenile officer in his mother's presence, he made a statement to police. The statement was later reduced to writing and signed by appellant and his mother.

In that statement Pierce related that Donald Steward, Michael Sturghill and he had gone to the lower level of the Browns' apartment building to shoot pool. Sturghill had run errands for the elderly women in the past and had a key to the building. While playing pool, they decided to steal some money from the sisters. The three forced open a door in the stairwell and ran up the stairs to the second floor where the sisters lived. They then broke out much of the glass in the door of the apartment and unlocked it from the inside. Pierce ran in yelling repeatedly, "Where's the money?" The Browns claimed they did not have any money.

Faustina attempted to use the phone, but appellant grabbed it from her. Faustina tried to cut appellant with a kitchen knife and he hit her hand several times to knock the knife out. Sturghill ran into the apartment pretending to come to the women's aid. He and appellant staged a fight. Appellant put his hand under his shirt as if he had a gun and ordered Sturghill and the sisters into a bathroom. Then appellant and Steward ransacked the apartment but were unable to locate any money. While in the bathroom, the women confided to Sturghill that they had their money with them in a coin purse.

Appellant returned to the bathroom, found out about the money and Ruthie Brown's purse was taken from her. Pierce and Steward ran out of the building and down an alley to Sturghill's garage, where they waited for him. When Sturghill arrived, they divided the money. This was the extent of appellant's first statement.

While he was being held at the juvenile facility, appellant's tennis shoes were seized. The pattern on the shoes matched the shoe print found on the broken door at the Browns' residence. Appellant's clothing contained bloodstains which matched blood found in several areas of the crime scene.[3] In addition, appellant's palmprint matched a print found on a can of roach powder located on the floor of the Brown residence.

Approximately one month after he was taken to the juvenile facility, the juvenile court dismissed the juvenile petition. He was then arrested on the same charges and again advised of his *Miranda* rights. At that time appellant indicated that he did not wish to make a statement on the advice of his attorney.

Two or three days later, and still in the holdover cell, appellant asked the police officer who operated the holdover to contact the homicide division and have them talk with him. Appellant had been sobbing on and off for some time and appeared to be distraught. The holdover cell consisted of a metal bunk, a toilet and a face bowl. Blankets and pillows are not allowed in the cells. Appellant's repeated requests for a blanket were thus denied.

3. There is no indication that either of the Brown sisters were ever cut. The blood at the scene was that of appellant and Donald Steward. It appears that they cut themselves in the process of breaking the glass in the French door and reaching inside to unlock it.

The officer complied with his request and called the homicide division. Within an hour, a detective came to the holdover, removed appellant from his cell and took him to the homicide office where he was again advised of his *Miranda* rights. Appellant indicated that he understood his rights and told the detective he wanted to make another statement because he had not told the "whole truth" when he made the first statement.

In his second statement, appellant gave a more detailed account of the incident. He related that Sturghill, Steward and he went to the Brown residence with the intent to steal. Appellant and Steward put baby powder on their faces. Steward broke the glass in the French door and appellant cut his hand when he reached through the broken glass and picked the lock.

Appellant stated that when Faustina Brown tried to use the phone, he pulled it away and tore off the cord. Faustina fell to the ground. After Sturghill handed him a stick from a window blind, appellant claimed he waived it in the air and beat the floor and furniture with it in order to frighten the elderly women. On at least one occasion, appellant said he hit the couch while Ruthie was sitting on it. He also struck Faustina's hand with the stick after she hit him in the leg with a knife. Appellant admitted that he snatched the coin purse from Ruthie.

Appellant maintained that he never touched Ruthie. However, in response to questions asked during the taking of the statement, appellant admitted that in addition to striking Faustina on the hand, he probably hit her on the neck or arm or "something." He also acknowledged that he could have hit her on the head and that Sturghill or Steward may have hit either of the women without him seeing it.

After being taken to the hospital the night of the break in, Faustina was treated and released the following day. Shortly thereafter, she became lethargic and complained of pain in her head. She returned to the hospital and was diagnosed as having a subdural hematoma, which was treated surgically. After surgery, Faustina's condition improved somewhat, but necessitated convalescent home care. While in the convalescent home, she developed complications resulting in an infection. She died several months later.

A pathologist testifying for the state concluded that Faustina's death was the product of complications resulting from the subdural hematoma. It was his opinion that the injury resulted from a blow or fall which occurred during the assault.

The pathologist testified that Ruthie Brown's death was a homicide. Although she suffered from severe coronary artery disease, the pathologist believed she died from cardiac decompensation caused by the stress of the assault.

Appellant was charged with two counts of first-degree murder, first-degree robbery and first-degree burglary. At trial the court submitted second-degree felony murder instructions for each death. Acquitted of all murder charges, appellant was convicted on the robbery and burglary counts. This appeal followed.

## II.

On transfer, we need only decide appellant's point that the trial court erred in denying appellant's motion to suppress the second taped statement and allowing it to be played at trial. We do not decide the remaining issues raised on appeal, given our decision requiring reversal and remand.

Appellant maintains that admitting the statement at trial violated his right to a fair trial with due process as guaranteed by the sixth, eighth and fourteenth amendments and was against his fifth amendment right to silence. He argues that this statement was inadmissible because he was a juvenile and the police officers failed to notify his mother, a juvenile officer or his attorney before they took his statement. He accuses the police officers of ignoring juvenile procedures. Section 211.061(1), RSMo 1986. Citing *State v. Arbeiter*, 408 S.W.2d 26 (Mo.1966), appellant urges that the protections of the juvenile code remain in force even after the juvenile court dis-

misses a juvenile petition and a child is to be tried as an adult.

### A.

Appellant's reliance on *Arbeiter* is misplaced. In *Arbeiter*, this Court held inadmissible statements which were elicited from a fifteen-year-old defendant by police interrogators *before* he was taken to a juvenile facility. The court found that failure to comply with Section 211.061(1) compelled such a result.

In this case, both the spirit and the letter of Section 211.061 were carefully followed. Immediately after apprehending him, the police took Pierce directly to the juvenile facility.[4] Both his mother and a juvenile officer were present when appellant made his first statement.[5] Appellant does not challenge the admissibility of the first confession on appeal.

Following a hearing, the juvenile court relinquished jurisdiction over appellant. Appellant made his second confession, which is the only statement at issue here, subsequent to his arrest as an adult.

As to whether the juvenile code remains in force after the juvenile court relinquishes jurisdiction over a juvenile, *Arbeiter* is silent. *Arbeiter* recognizes, however, that the purposes of the careful procedures adopted in our juvenile code are to provide

> both a responsibility and an opportunity for the state, through special treatment in a non-criminal proceeding, to redirect and rehabilitate these young people.... Unquestionably, the purpose [of the juvenile code] was to alter the usual method of handling persons arrested on suspicion or for investigation of criminal activities when those persons are juveniles. Moreover, it is apparent that this alteration of methods was intended to protect the interests of juveniles rather than to facilitate police investigations....

*Arbeiter*, 408 S.W.2d at 26, 30, quoting *State v. Shaw*, 93 Ariz. 40, 378 P.2d 487, 491–493 (1963).

Once the juvenile court dismisses a juvenile from its jurisdiction, the protections afforded by the juvenile code are no longer appropriate. We need not preserve the opportunity to redirect and rehabilitate the juvenile. The decision to relinquish jurisdiction by the juvenile court is after all founded on, *inter alia*, a determination that a child will not benefit from juvenile treatment and rehabilitation programs. Section 211.071(6), (8).

We therefore hold that the specific provisions and protections of the juvenile code terminate when a juvenile petition is dismissed in accordance with Section 211.-071(1) and a juvenile is tried under general law as an adult. This holding is consistent with this Court's decision in *Interest of A.D.R.*, 603 S.W.2d 575, 580 (Mo. banc 1980). There we said "Once the juvenile court has relinquished jurisdiction, the juvenile is subject to criminal prosecution as an adult ... and any juvenile treatment rights terminate." The detectives' failure to follow Section 211.061(1) prior to the second confession is of no consequence to the admissibility of that confession.

### B.

The fact that the protections of the juvenile code were no longer applicable to appellant at the time of his second confession does not finally resolve the issue of the admissibility of that confession. Appellant argues that under the circumstances of this case, the waiver of his right to counsel was not voluntary and therefore his statement was both involuntary and inadmissible.

After an individual has been advised of his *Miranda* rights, no statement he makes may be used against him unless he makes a knowing, intelligent, under-

---

4. Section 211.061(1), RSMo 1986.
   When a child is taken into custody with or without warrant for an offense, the child, together with any information concerning him and the personal property found in his possession, shall be taken immediately and directly before the juvenile court or delivered to the juvenile officer or person acting for him.

5. Section 211.131(2), RSMo 1986.
   When a child is taken into custody, the parent, legal custodian or guardian of the child shall be notified as soon as possible.

standing and voluntary waiver of those rights. "The test for 'voluntariness' is whether under the totality of the circumstances defendant was deprived of a free choice to admit, to deny, or to refuse to answer, and whether physical or psychological coercion was of such a degree that defendant's will was overborne at the time he confessed." *State v. Lytle*, 715 S.W.2d 910 (Mo. banc 1986).

■ In cases where a confession is made by an adolescent, the age of the individual alone is insufficient to prevent a valid waiver. *United States v. Ramsey*, 367 F.Supp. 1307 (1973). Minority, however, may be among several important factors which must be carefully considered in determining the voluntariness of a confession. *State v. Sinderson*, 455 S.W.2d 486 (Mo. 1970). "In proper circumstances, persons of the defendant's age [16] and younger may waive their rights to remain silent and to counsel, etc. Rather, whether a valid waiver has been made must be determined in each particular case upon the particular facts and circumstances of that case." *Ramsey*, 367 F.Supp. at 1312.

In this case, appellant had been taken from the juvenile facility, arrested as an adult and incarcerated in a holdover cell at the city jail. He was alone in that cell for several days, was refused bed clothing, and had been sobbing. Ultimately he asked to talk with the homicide officers; when they arrived, he gave his second statement. These officers were aware, or should have been aware, that appellant had an attorney and had refused to make a statement earlier on advice of that attorney. Yet the officers made no effort to contact the attorney, nor any other adult upon whom defendant could rely. All of these factors make appellant's waiver of his right to counsel and the voluntariness of his subsequent statement suspect. Under the circumstances of this case, the appropriate course of action would have been to call the attorney; such a course of action would vitiate the need to consider the constitutional question now before us.

We turn now to consider the voluntariness of appellant's confession. While ap-

pellant's age is not a controlling factor, when combined with other circumstances it becomes a significant consideration. The United States Supreme Court has emphasized that admissions and confessions of juveniles require special caution. That court suggests that with regard to juveniles, "the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *In re Gault*, 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527 (1967).

In *Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), a fifteen-year-old defendant confessed after being advised of his constitutional rights. The United States Supreme Court cast doubts as to whether a fifteen year old, without aid of counsel, could fully appreciate such advice and therefore have freedom of choice. In *Gallegos v. State*, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), a fourteen year old was found to have been deprived of constitutional protection under a "totality of circumstances test" when he made a confession without the opportunity to consult an attorney, parent or other friendly adult. "A lawyer or adult relative could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators." *Gallegos*, 370 U.S. at 54, 82 S.Ct. at 1213.

In *State v. White*, 494 S.W.2d 687 (Mo. App.1973), a fifteen year old was taken into custody on burglary and assault charges and brought before the juvenile court which, after a hearing, dismissed the juvenile petition. The next day White made a videotaped statement. He was represented at the juvenile hearing by the same attorney who later represented him in the circuit and appellate courts. Although his mother was present at the juvenile hearing, neither she nor his attorney were notified before the taped statement was made. The court said:

> [T]hat where a child of tender age has parents and an attorney, and that child is in the custody of the police or other law

enforcement agencies, that prior to any in-custody interrogation the police or other law enforcement officer shall make a *reasonable effort* to notify and to have present both his parents and attorney. Or otherwise, any statement obtained without either the parent, attorney or an adult friend will be excluded. To hold otherwise would defeat the high purpose to be served by the Sixth Amendment and would contravene the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime.

[Emphasis added.] *White,* 494 S.W.2d at 692.

■ Here we find a fifteen-year-old boy incarcerated in a holdover cell without communication with either his attorney or family members, sobbing in apparent fear and despair. After several days he decides to make a more detailed confession. While the circumstances were arguably more intimidating and coercive in *Haley* and *Gallegos* [6] than in this case, the rationale of those cases, and that expressed in *White,* is nonetheless applicable. Given these circumstances, we find that appellant's waiver of his right to counsel was not valid and his second confession was involuntary. The constitution forbids the use of an involuntary confession at trial. *Miranda v. Arizona,* 384 U.S. 436, 475–476, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). The trial court erred in denying appellant's motion to suppress the taped statement and allowing it to be played at trial. The magnitude of that error now requires reversal and remand.

### III.

The judgment of the trial court is reversed and the cause remanded for further proceedings consistent with this opinion.

All concur.

---

**6.** *Haley* was questioned throughout the night by relays of police officers. *Gallegos* was held incommunicado for five days.