**STATE of Missouri, Respondent,**

v.

**Levar C. AIKENS, Appellant.**

**No. WD 55322.**

Missouri Court of Appeals,
Western District.

Aug. 10, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 5, 1999.

Application for Transfer Denied
Nov. 23, 1999.

Emmett D. Queener, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Cheryl Caponegro Nield, Asst. Atty. Gen., Jefferson City, for respondent.

Before Judge ALBERT A. RIEDERER, Presiding, Judge FOREST W. HANNA and Judge LAURA DENVIR STITH.

LAURA DENVIR STITH, Judge.

Defendant Levar Aikens appeals his convictions for first degree murder and armed criminal action in violation of Sections 565.020.1 and 571.015 RSMo 1994,[1] for which he was sentenced to concurrent terms of life imprisonment without the possibility of probation or parole and life

1. All statutory references are to RSMo 1994 unless otherwise indicated.

imprisonment, respectively. On appeal, Defendant alleges that the trial court erred in admitting hearsay testimony as to statements made by the victim in the weeks before her death, and that the trial court erred in denying his motion to suppress his statements to Detective Cowdrey because, he asserts, the statements were taken in violation of his Sixth Amendment right to counsel. Finding that Defendant failed to preserve his objections to the hearsay statements now objected to, and that Defendant's Sixth Amendment right to counsel was not violated, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 12, 1996, workers from the Union Pacific Railroad found a suitcase containing the body of Yvette Aikens next to a shallow creek under a bridge. An autopsy revealed a bullet wound to the right side of her head and another bullet wound in her back. The medical examiner classified the death as a homicide.

Ms. Aikens was last seen by Leslie Sanderson, the manager of the apartment complex where she worked, on Friday, June 7, 1996, when she left work at 5:30 p.m. Ms. Aikens did not show up at work on Monday, June 10, 1996, and many tenants complained to him that the office had been closed all weekend, despite the fact Ms. Aikens had been scheduled to work both Saturday and Sunday. Mr. Sanderson received no answer when he called Ms. Aikens' house, and an unidentified male answered Ms. Aikens' cellular phone and said Ms. Aikens was unavailable.

Mr. Sanderson called the police on Wednesday, June 12, 1996, and filed a missing persons report after Ms. Bea Sanders, a friend of Ms. Aikens, called him to inquire about her absence. The Kansas City Police Department obtained a search warrant and entered Ms. Aikens' home that same day. Once inside, the police found blood-soaked towels in some trash bags on the front porch, a blood-soaked paper towel, a blood stain on the dining room carpet un-

der an area rug, and a two-shot, single action, .38 caliber derringer pistol underneath the sofa. Tests performed at the Kansas City Regional Crime Laboratory revealed that the blood from the carpet, the foam padding from underneath the carpet, and the paper towels taken from Ms. Aikens' house matched a blood sample drawn from Ms. Aikens. A firearms expert testified that one of the bullets removed from Ms. Aikens' body matched bullets test-fired from the derringer retrieved from the house. The other bullet removed from Ms. Aikens was too damaged to make a comparison. In addition, the police found a note to the victim from her sixteen-year old son, Defendant Levar Aikens, in a trash bag in a storage area off the kitchen. In this letter, Defendant accused his mother of telling him he was worthless, and outlined his plan to transfer schools, to spend time with his friends and his girlfriend, and to play basketball. The letter further stated that Defendant would do whatever it took to "meet his needs," including taking his mother's car and her cellular telephone.

On June 13, 1996, Defendant was arrested at a motel. When he was arrested, Defendant was driving his mother's tan Mercury automobile and had his mother's cellular phone with him. Ms. Sanders later testified that Ms. Aikens did not allow Defendant to use her cellular phone, and that he had been forbidden to drive his mother's car since June 1, 1996. On June 14, 1996, 18 year-old Charles "Chuckie" Curry, an acquaintance of Defendant, was taken by his parents to the police station, where he told police that Defendant had confessed to him that he shot Ms. Aikens. That same day, police obtained a search warrant for the Mercury and processed the car with Luminol, a chemical that detects the presence of blood and causes it to luminesce. Test results confirmed the presence of blood on the interior of the trunk of the car.

On July 26, 1996, Defendant was certified to stand trial as an adult for the

murder of his mother. After the certification proceedings, he was arrested and transported to the police station and placed in a cell. On August 16, 1996, Defendant was indicted for the first degree murder in the death of his mother, and for armed criminal action. Defendant went to trial on November 17, 1997. At trial, the State introduced the statements made by Ms. Aikens to Ms. Sanders shortly before her death. Ms. Sanders testified that she and her daughter had a close relationship with Defendant, and that she spoke frequently with her friend Ms. Aikens. Ms. Sanders also testified that Ms. Aikens told her about Defendant's behavioral problems, and her intent to place him in a residential school for troubled youth in Parkville, Missouri. Ms. Sanders stated that Ms. Aikens had kicked Defendant out of the house, and had then asked her for money with which to change the locks on the doors of her house to prevent Defendant from sneaking back inside. Ms. Sanders refused to give Ms. Aikens this money. Ms. Sanders also testified that when she first asked Defendant where his mother was after she had been missing a few days, Defendant told her that his mother had been killed by a carjacker. Later, he told Ms. Sanders that he thought that his mother's ex-boyfriend, Lloyd Dixon, had killed her. Ms. Sanders testified that on another occasion, Defendant wrote a letter to members of the Sanders' family stating that a drug dealer named "Marvin" had killed his mother.

Ms. Aikens' former boyfriend, Mr. Dixon, testified that she called him on June 6, 1996, asking him for money with which to change the locks on her house. He agreed, and the locks were changed that day. Mr. Dixon also testified that on Monday, June 10, 1996, he called Ms. Aikens' cellular phone number and discovered that her voice-mail message had been changed to a message recorded by Defendant.

Chuckie Curry testified that he and another friend were at Defendant's house when he observed Defendant lift up a rug on the carpet near the kitchen, exposing two large blotches of "red stuff." He testified that he watched Defendant put some paper towels on the spots, step on them, and then drop the rug over the paper towels. Later, Chuckie said, Defendant said that he had shot his mother twice. Chuckie identified the gun recovered by police as the same gun Defendant showed him when confessing. Mr. Ted Carter later testified that, approximately two days before Ms. Aikens was shot, he helped Defendant purchase a gun.

Detective Jeff Cowdrey testified that after Defendant was certified to stand trial as an adult, but before he was charged, the detective took Defendant into an interrogation room, and apprised Defendant of his Miranda rights. Defendant signed a Miranda waiver. Defendant stated that he had been advised by his juvenile attorney not to speak to the police, but that he was no longer represented by her, since he had been certified to stand trial as an adult. He told the detective that he did not have an attorney, and that he was willing to answer the detective's questions. Detective Cowdrey testified that Defendant gave contradictory accounts of his activities from Monday, June 5, 1996, to Sunday, June 9, 1996, but that when directly asked about his mother's death, Defendant denied any involvement.

Defendant testified in his own defense. He stated that he sold drugs for "Mr. B," that he told "Mr. B" that he wished to stop selling drugs, and that he introduced Chuckie Curry to "Mr. B" as his replacement. Defendant testified that it is unusual for a person to stop selling drugs without being killed by the individual for whom he sells the drugs, and that he offered Chuckie to "Mr. B" as his replacement in the hope that "Mr. B" would not kill him. He testified that he thought that "Mr. B" was satisfied with this arrangement, because shortly after taking Chuckie to meet "Mr. B" on Saturday, June 11, "Mr. B" invited Defendant over to his house to play Sega games. Defendant testified that he

left Chuckie alone with his mother when he left for "Mr. B's" house that day. When he returned home approximately two hours later, he found blood all over the house. Defendant testified that Chuckie came back later and said, "I'm sorry." Defendant testified that he took Chuckie's apology to mean that Chuckie had killed his mother. Defendant testified that Chuckie was able to identify the gun used to shoot his mother because he gave Chuckie the gun for protection when he went to meet "Mr. B."

The jury found Defendant guilty of first degree murder and of armed criminal action. He was sentenced to life imprisonment without the possibility of parole for the conviction of first degree murder and received a concurrent sentence of life imprisonment for the conviction of armed criminal action. Defendant appeals.

## II. THE ADMISSION OF HEARSAY TESTIMONY WAS NOT PLAIN ERROR

■ Defendant first asserts that Ms. Sanders' testimony about statements made to her by Ms. Aikens constituted hearsay, the admission of which requires reversal. Hearsay is testimony concerning an out-of-court statement made by another, offered to prove the truth of the matter asserted. *State v. Barnett*, 980 S.W.2d 297, 306 (Mo. banc 1998). Such statements are usually inadmissible, unless they fit within certain hearsay exceptions. *Id.*

Defendant cites five instances when the State improperly introduced hearsay testimony from Ms. Sanders about the victim and Defendant. Specifically, Defendant objects to Ms. Sanders' testimony: (1) that Defendant was not remaining at school after being dropped off by Ms. Aikens; (2) that during three phone calls on June 5, 6, and 7, 1997, Ms. Aikens stated that she was having problems with Defendant; (3) that Ms. Aikens was going to enroll Defendant in a residential school for troubled youth in Parkville; (4) that Ms. Aikens was going to call the police regarding De-

fendant so he could be placed in the Parkville school; and (5) that Ms. Aikens requested money to change the locks so that she could keep Defendant out of the house because she did not approve of his being involved in drugs and street life.

■ On appeal, the State concedes that these statements by Ms. Sanders were hearsay and that no exception applied, but points out that all of this testimony came in without objection. The general rule is that, where a timely objection is not made to the introduction of hearsay statements, their admission is not plain error. *State v. Weston*, 926 S.W.2d 920, 922 (Mo.App. W.D.1996). While Defendant argues a miscarriage of justice would occur if we were to apply this rule here, we disagree. Much of the testimony complained about was either cumulative of evidence otherwise properly admitted, or was corroborated by Defendant in his own testimony. We find no basis on which to review for plain error. Point denied.

## III. THE COURT DID NOT ERR IN DENYING THE MOTION TO SUPPRESS

■ Defendant asserts in his second point that the trial court erred in denying his motion to suppress statements he made to Detective Cowdrey during an interview that he claims was held in violation of his Sixth Amendment right to counsel. Defendant claims that, because he was a juvenile certified to stand trial as an adult, the detective should have known that he was represented by counsel, and, in this circumstance, the detective's failure to "make a reasonable effort to have counsel present" for Defendant at the time of the interview resulted in a *per se* violation of Defendant's Sixth Amendment rights.

■ In reviewing a trial court's denial of a motion to suppress, we determine whether the evidence was sufficient to sustain the trial court's ruling. *State v. Ricketts*, 981 S.W.2d 657, 659 (Mo.App. W.D. 1998). We will not reverse unless we find

that the trial court abused its discretion. *Id.*

The State alleges that denial of the motion to suppress could not have been error, for Defendant's Sixth Amendment rights had not yet attached at the time of his questioning by Detective Cowdrey because no indictment or information had been filed. The cases that the State cites for this proposition, *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *State v. Beck,* 687 S.W.2d 155 (Mo. banc 1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986), and *State v. Parker,* 886 S.W.2d 908 (Mo. banc 1994), *cert. denied,* 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995), however, are not dispositive, for they concern when the Sixth Amendment right to counsel attaches in the case of an adult defendant.

*State v. White,* 494 S.W.2d 687, 690 (Mo. App.St.L.1973), made it clear that where, as here, the defendant is a juvenile who has been certified to stand trial as an adult, the courts will consider the voluntariness of the waiver even if the waiver is given prior to the time defendant is charged. In *White,* the defendant, then 15, was charged with felony assault and burglary. He had an attorney who had been retained by his mother. On July 30, 1971, defendant was certified to stand trial as an adult. On July 31, 1971, a police officer advised defendant of his rights, and asked the defendant whether he wished to make a statement. Defendant responded "yes," and the detective proceeded to videotape the interview. Neither defendant's mother nor his counsel was notified of the interview, or given a chance to be present.

*White* acknowledged that the interrogation had taken place before an indictment or information had been filed, but held that, under the totality of the circumstances, the statements were involuntary, and taken in violation of the defendant's Sixth Amendment right to counsel. *Id.* at 691–692. The court stressed that defendant's mother and attorney were available at the time of the questioning, and that the failure to notify either "effectively waters down and makes hollow the Sixth Amendment right to counsel." *Id.* at 691.

█ In so ruling, *White* identified nine non-exclusive factors which the courts should consider in determining voluntariness. These include: 1) defendant's physical age; 2) defendant's psychological age; 3) defendant's previous court experience; 4) advice or presence of defendant's parents or guardians; 5) physical conditions borne by defendant prior to and during questioning; 6) whether defendant was held incommunicado prior to questioning; 7) defendant's level of education; 8) the method of questioning used by police; and 9) whether a violation of a statute or court rule has occurred. *White,* 494 S.W.2d at 690.

The Supreme Court applied *White*'s analysis in *State v. Pierce,* 749 S.W.2d 397 (Mo. banc 1988). Defendant was a 15–year old boy who hired counsel after being certified as an adult. He was held incommunicado in a holdover cell for two or three days and repeatedly denied a blanket. He finally broke down sobbing and asked to speak to a detective. Despite the knowledge that defendant had counsel and parents then available to be present at the questioning, the detective took the boy's statement without notifying his attorney. *Id.* at 399–400.

*Pierce* held that, once a juvenile has been certified to stand trial as an adult, all protections provided by the juvenile code terminate, and the juvenile may waive his or her right to remain silent and other constitutional rights. *Pierce,* 749 S.W.2d at 401–02. Nonetheless, citing *White* with approval, *Pierce* held that the juvenile's age must still be taken into consideration when the court determines whether defendant's statements were voluntary "under the totality of the circumstances." It recognized that, while age may not in itself be the dispositive factor in a decision as to voluntariness, it can be significant when combined with other circumstances indi-

cating a lack of voluntariness. *Id.* at 402. *Pierce* found the juvenile's confession involuntary in light of the coercive circumstances of the confession and the failure to notify the defendant's parents or counsel before questioning him, despite their availability. *Id.* at 403.

In applying the factors identified in *White* to this case, we note that Defendant was a 16–year old high school student of apparently normal intelligence, without any documented prior adult court experience. He spoke to the detective a few hours after being certified to stand trial as an adult, and was not held incommunicado for any discernable length of time. He had no parents or guardians available (the record shows nothing about his father, and he had just killed his mother).

While Defendant told the detective that he had been advised by his juvenile court attorney not to speak to any police officers, he also affirmatively told the detective that he had now been certified as an adult and did not have an attorney at that time. After Detective Cowdrey read Defendant his Miranda rights, Defendant signed a Miranda waiver and agreed to talk to the detective, but stated that he did not want to talk about his mother's death.[2] Defendant then went on to detail his activities over the weekend of June 7, 8, and 9, 1996, and to deny any involvement in his mother's death. Later, when he was questioned about the interview at the hearing on his motion to suppress, Defendant reaffirmed that he had voluntarily agreed to speak to the detective, and that at no time did he request an attorney. He did not suggest at trial that his statements to the Detective were involuntary or made under duress.

Considering these facts, we find that here, unlike in *Pierce* or *White*, Defendant's statements in this case were made only after Defendant accurately and affirmatively told the detective that he did not

have counsel, that there was no duress or coercion, and that, considered in the totality of the circumstances, the statements were voluntary. The trial court did not err in denying Defendant's motion to suppress.

For the reasons set out above, the judgment is affirmed.

Presiding Judge ALBERT A. RIEDERER and Judge FOREST W. HANNA, concur.

---

**2.** Defendant explicitly states he is not claiming violation of his Fifth Amendment right to counsel, in light of his waiver of the right to

counsel following receipt of the Miranda warning.