[No. 36688-2-I.   Division One.   September 3, 1996.]

THE STATE OF WASHINGTON, *Respondent*, v.
JASON V. HARRELL, *Appellant*.

---

[22]*See Jones*, 69 Wn. App. at 130 (court applied agency principles in determining who signed a pleading in violation of CR 11).

394

*Kelly V. Curtin* and *Nielsen & Acosta*; and *Marjorie F. Valek*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Francis D. Zavatsky* and *Carmencita N. Gutierrez*, for respondent.

AGID, J. — Jason Harrell appeals his dispositions for possession of an incendiary device and an explosive device on the grounds that the trial court erred in failing to sup-

press both his custodial statements and evidence seized as the result of a purportedly illegal search. He argues that he lacks the capacity to understand and knowingly and intelligently waive his *Miranda*[1] rights and that there was insufficient evidence to support the trial court's finding that he was guilty of possessing an explosive device. We conclude that although he was not formally under arrest at the time he was searched, the officer had probable cause to arrest Harrell and lawfully searched him incident to arrest. We also disagree with Harrell's contentions that his waiver was invalid and the evidence was insufficient and affirm.

## FACTS

On August 7, 1994, a group of teenagers playing in Olympic View Park saw two teenage boys on an adjacent path just yards away. One was walking and the other was riding a bicycle. Three of the teenagers in the group recognized the boy who was walking as Harrell. Two saw Harrell carrying something under the jacket he had draped over one arm and saw him light what both assumed to be a cigarette. One then saw him make a throwing gesture but did not see what he threw. Moments later, there was an explosion and fire on the path on which the boys had been walking. Harrell and his companion were just a few feet from the explosion when it occurred. Harrell immediately climbed onto the back of his companion's bicycle, and both boys rode away, quickly leaving the park. The teenagers went to investigate. They saw a beer bottle and what looked like a sock or small towel amidst the flames that extended several feet from the bottle. While two of them attempted to extinguish the flames, the other two ran to call the fire department. By the time fire trucks arrived, the teenagers had put the fire out.

Fire Investigator Joy Veranth arrived at the park to

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3d 974 (1966).

investigate the fire and observed what she concluded were the charred remains of a molotov cocktail. Her conclusion was based on evidence at the scene, including the flammable liquid spray pattern left on the asphalt, a white sock that had been used as a wick, broken glass fragments from what appeared to have been a beer bottle, the smell of gasoline, and charred grass at the edge of the asphalt. Veranth photographed the scene and took recorded statements from three of the teenagers, who identified the two boys they had seen on the path as Toby Richmond and Harrell. They also identified Harrell as the boy they had seen handling the object he threw just before the explosion. Veranth then went to Harrell's home to speak with his parents. Because Harrell's mother thought he might be at the Crest View Apartments, Veranth followed her there. When they did not find Harrell at the Crest View Apartments, Veranth left.

At about the same time, Officer Jeffrey R. Dixon was dispatched to the Crest View Apartments to investigate a domestic violence incident involving Toby Richmond. The dispatcher also told him that Richmond might be with Harrell. When Veranth heard this transmission over the radio, she called Dixon and told him that the two were suspects in the incident she was investigating and that she wanted to speak to them. Shortly after arriving at the Crest View Apartments, Dixon saw Harrell riding a bicycle in the parking lot and advised him that he would be detained until Veranth arrived. Dixon initially intended to take Harrell with him while he made another round of the complex to look for Richmond. As he usually does for officer safety purposes, Dixon patted Harrell down prior to placing him in the back of his patrol car to wait for Veranth. The officer had noticed that the right pocket of Harrell's jacket, which Harrell was now wearing, bulged in a way that seemed unusual and, when Dixon's hand came in contact with it, he felt what he described as a small, hard, long and oval object among a number of other items in the pocket. His immediate concern was that it was a weapon, possibly the barrel of a small gun. When Dixon

removed the item from Harrell's pocket, it appeared to him to be a homemade bomb several inches long wrapped in black electrical tape with something that resembled a firecracker fuse extending from one end.[2] After patting Harrell down, Dixon handcuffed him because, based on their prior contacts, he felt uncomfortable placing Harrell in the back of the patrol car without handcuffs. Dixon testified that he did not subjectively intend to place Harrell under arrest at that time but intended only to detain him until Veranth arrived.

When Veranth arrived, Harrell was transferred from the back of Dixon's patrol car to the front seat of Veranth's car where Veranth questioned him. Veranth did not remove the handcuffs because she does not carry a weapon. She asked Harrell whether he was comfortable and whether he had ever been advised of his rights before. He responded affirmatively to both questions. Veranth read Harrell his *Miranda* rights from a standard card, explaining each one as she read. She noticed that he followed the words on the card with his eyes as she read. Veranth testified that Harrell indicated he understood his rights and that he was very forthcoming in describing the fire incident. At no time did he request a lawyer or indicate that he did not want to speak with her. After he told her what had happened once, Veranth asked him if she could record his statement. He answered without any hesitation that she could. He then repeated what he had told her for the tape recorder. After Harrell completed his statement, Dixon removed the handcuffs.

Harrell was charged with first degree reckless burning, possession of an incendiary device, and possession of an explosive device. At the fact finding hearing, Harrell moved to suppress both his custodial statements and the evidence seized as a result of the search. The trial court found that both the search and the custodial interrogation were lawful and denied both motions. The court found Harrell guilty of possession of an incendiary device and of

---

[2]Veranth described the object as one inch in diameter and four inches long.

an explosive device but dismissed the charge of first degree reckless burning. It denied his motion for reconsideration of the guilty verdict on the possession of an explosive device charge. This appeal followed.

## DISCUSSION

### Admissibility of Explosive Device

Harrell contends that the trial court erred when it denied his motion to suppress the explosive device found in his possession, arguing that absent specific, articulable facts from which the officer could have inferred that Harrell was armed and dangerous, the officer's search exceeded the permissible scope of a search for weapons. Because the officer had probable cause to arrest Harrell at the point at which he conducted the search, we hold that the search was proper incident to his arrest. We do not need to reach the question whether the search was also within the permissible scope of a patdown search for weapons for officer safety purposes.

■■■■ " 'The Fourth Amendment . . . guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." ' " *State v. Rodriguez-Torres*, 77 Wn. App. 687, 690, 893 P.2d 650 (1995) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S. Ct. 2130, 2135, 124 L. Ed. 2d 334 (1993)). Searches and seizures must be supported by probable cause whether or not a formal arrest has been made. *State v. Hudson*, 124 Wn.2d 107, 874 P.2d 160 (1994) (citing *Dunaway v. New York*, 442 U.S. 200, 208, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979)).

> Probable cause exists where the facts and circumstances within the arresting officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in a belief that an offense has been committed.

*State v. Terrovona*, 105 Wn.2d 632, 643, 716 P.2d 295 (1986)

(quoted in *Rodriguez-Torres*, 77 Wn. App. at 693). The question whether probable cause exists is an objective inquiry. *Rodriguez-Torres*, 77 Wn. App. at 693; *State v. Goodman*, 42 Wn. App. 331, 337, 711 P.2d 1057 (1985), *review denied*, 105 Wn.2d 1012 (1986). Thus, when officers conduct a joint investigation, the cumulative information possessed by all the officers may be considered in assessing whether the police had probable cause to arrest. *State v. Alvarado*, 56 Wn. App. 454, 456, 783 P.2d 1106 (1989), *review denied*, 114 Wn.2d 1015 (1990). For that reason, we need not limit our examination of the facts to those within the personal or subjective knowledge of the arresting officer. *Alvarado*, 56 Wn. App. at 456. As long as probable cause exists at the time of the search, the search may be considered a search incident to arrest even if it occurs shortly before an arrest. *Rodriguez-Torres*, 77 Wn. App. at 694; *State v. Brantigan*, 59 Wn. App. 481, 485-86, 798 P.2d 1176 (1990); *State v. Ward*, 24 Wn. App. 761, 765, 603 P.2d 857 (1979), *review denied*, 93 Wn.2d 1019, *cert. denied*, 449 U.S. 984 (1980). The need to remove weapons which might be used to assault an officer and prevent destruction of evidence justifies a search incident to arrest. *Sibron v. New York*, 392 U.S. 40, 67, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968); *State v. Johnson*, 128 Wn.2d 431, 451, 909 P.2d 293 (1996).

Here, three witnesses had identified Harrell to Investigator Veranth as one of the two boys in the immediate vicinity of the explosion when it occurred. Two saw Harrell light something and one saw him throw something just moments before the explosion. The witnesses had also told Veranth that Harrell and his companion hurried out of the park immediately after the explosion. Veranth heard over the radio that Dixon was responding to a domestic violence call involving Richmond, who had been identified by the same witnesses as the second boy in the park. She then told Dixon of the arson investigation and asked him to hold either Harrell or Richmond in connection with that investigation if he found them.

Under these facts, Officer Dixon had probable cause to

believe that Harrell had committed the offense of possession of an incendiary device. Although Officer Dixon did not subjectively consider Harrell under arrest when he detained him, the search was nevertheless a valid search incident to arrest because probable cause to arrest Harrell for that offense existed at the time he conducted the search. Dixon's primary concern in conducting the search was officer safety.[3] The trial court properly denied Harrell's motion to suppress the explosive device found in his possession in the course of that search.

### Admissibility of Harrell's Statement to Police

██ ██ Harrell next argues that the trial court erred in admitting his statement to the police. He asserts that he lacks the ability to understand and to knowingly and intelligently waive his *Miranda* rights because he suffers from attention deficit hyperactivity disorder (ADHD) and a learning disability. In determining whether a juvenile's confession is voluntary, a court must consider the totality of the circumstances, including the juvenile's age, experience, education, background, intelligence and capacity to understand the warnings given, the nature of those rights and the consequence of waiving those rights. *State v. Furman*, 122 Wn.2d 440, 450, 858 P.2d 1092 (1993); *State v. Schatmeier*, 72 Wn. App. 711, 719-20, 866 P.2d 51, *review denied*, 124 Wn.2d 1019 (1994). In *Dutil v. State*, 93 Wn.2d 84, 90, 606 P.2d 269 (1980), the Supreme Court explained:

Studies which the petitioners have called to our attention

---

[3]As the Supreme Court explained in *Terry v. Ohio*, 392 U.S. 1, 23-24, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), a strong government interest exists in police officer safety:

We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

indicate that juveniles often do not understand the full import of the exercise or waiver of their constitutional rights. This is not surprising. Indeed, we would be surprised if many adults can be said to have such comprehension. As this court held in *State v. Aiken*, 72 Wn.2d 306, 434 P.2d 10 (1967), the test is whether a person knew he had the right to remain silent, and that anything he said could be used against him in a court of law, not whether he understood the precise legal effect of his admissions. If a juvenile understands that he has a right, after he is told that he has that right, and that his statements can be used against him in a court, the constitutional requirement is met.

(Citation omitted.) The fact that a juvenile receives low scores on aptitude tests is a factor to be considered but does not necessarily render a confession inadmissible. *State v. Massey*, 60 Wn. App. 131, 142, 803 P.2d 340, *review denied*, 115 Wn.2d 1021 (1990), *cert. denied*, 499 U.S. 960 (1991).

Harrell relies primarily on the testimony of Dr. Daniel Stowens, a pediatric neurologist who examined Harrell on two occasions for a total of less than three hours, to contend that he was unable to understand his *Miranda* rights sufficiently to knowingly and intelligently waive them. Dr. Stowens testified, however, that he could not really assess whether Harrell understood the *Miranda* warnings because he was not there at the time to make that observation one way or the other. He did testify that Harrell has ADHD[4] and that children with ADHD generally have a more difficult time understanding spoken or written information than other children. But he also agreed that Harrell is a "functioning individual" capable of understanding "well enough to function to his own benefit" and able to waive his rights.[5] Dr. Stowens also concluded that Harrell had a learning disability based on his mother's report

[4]Dr. Stowens explained that ADHD is not a diagnosis but a description of a pattern of behavior, i.e., impulsive and distractible behavior.

[5]Dr. Stowens qualified this remark only by saying he is not sure anybody really understands the *Miranda* rights. He was also of the opinion that no one "in their right mind," adult or juvenile, would waive them.

that he had a history of poor school performance and Harrell's occasional need for prompting during his interview. He had not, however, tested Harrell for language comprehension and did not know what his IQ was.

Dr. Stowens' testimony does not support Harrell's contention that he lacks the ability to understand his *Miranda* rights and to knowingly and intelligently waive them. The trial court observed that Harrell was alert and attentive to witnesses' testimony during trial and that, based on his behavior in court, he generally appeared to be an intelligent and "comprehending human being." There is no basis for concluding that Harrell lacked the ability to knowingly and intelligently waive his *Miranda* rights.

Harrell also argues that Veranth and Dixon created a coercive setting that any juvenile would have found intimidating. *See State v. Cushing*, 68 Wn. App. 388, 392, 842 P.2d 1035 (a confession that is the product of coercion, physical or psychological, is involuntary and not admissible), *review denied*, 121 Wn.2d 1021 (1993). But the record controverts this argument, too. Although Harrell was handcuffed and placed in the back of a patrol car to wait for Veranth, there is no evidence to suggest that he was intimidated. Contrary to his assertion in his brief, the record reflects that he was not terse in responding to Veranth's inquiries. Rather, Veranth described Harrell as very talkative and very pleasant during the interview. She also described him as "very quick" verbally, so much so that he occasionally prompted her when she spoke too slowly. Veranth testified that she did not notice anything that would lead her to think Harrell had a language deficiency or any kind of mental or emotional problem. Because she noticed nothing that suggested a problem, she did not inquire further. Dixon testified to the following: he was present when Veranth read Harrell his *Miranda* warnings; Harrell answered promptly and in the affirmative that he understood each one; he did not observe any communication difficulty between Veranth and Har-

rell; and Harrell was very talkative, and the tenor of the conversation was congenial, "like good old buddies." Dixon also testified that Harrell was able to follow Dixon's directions with ease. That Veranth told him he was not under arrest and would be able to leave on his bicycle when the interview was over does not change this. Harrell's demeanor in answering the questions suggests that he understood Veranth's statement as the effort to avoid intimidating him that it was clearly intended to be. The trial court did not err in holding that Harrell's statement was admissible.

## Sufficiency of the Evidence

■ Finally, Harrell argues that the trial court's finding that he was guilty of possessing an explosive device was not supported by substantial evidence. In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). All inferences are resolved in favor of the prosecution. *State v. Maxey*, 63 Wn. App. 488, 491, 820 P.2d 515 (1991) (citing *State v. Smith*, 104 Wn.2d 497, 507, 707 P.2d 1306 (1985)). An inference is a logical deduction or conclusion that the law allows, but does not require, once basic facts are established. *Maxey*, 63 Wn. App. at 491 (citing *State v. Jackson*, 112 Wn.2d 867, 874, 774 P.2d 1211 (1989)).

■ RCW 70.74.180, which prohibits possession of an explosive device, provides:

> Any person who has in his possession or control any shell, bomb, or similar device, charged or filled with one or more explosives, intending to use it or cause it to be used for an unlawful purpose, is guilty of a felony . . .

RCW 70.74.010(3) defines "explosive" or "explosives" to include

any chemical compound or mechanical mixture that is commonly used or intended for the purpose of producing an explosion, that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities or packing, that an ignition by fire, by friction, by concussion, by percussion, or by detonation of any part of the compound or mixture may cause such a sudden generation of highly heated gases that the resultant gaseous pressures are capable of producing destructive effects on contiguous objects or of destroying life or limb. . . . For the purposes of this chapter small arms ammunition, small arms ammunition primers, smokeless powder not exceeding fifty pounds, and black powder not exceeding five pounds shall not be defined as explosives, unless possessed or used for a purpose inconsistent with small arms use or other lawful purpose.

Harrell argues that "[w]ithout [chemical] testing and precise measurement, there can be no proof beyond a reasonable doubt that [the substance] was indeed smokeless [or black] gunpowder" and, therefore, as a matter of law, the trial court's finding that the object was an explosive device was not supported by substantial evidence. No Washington case so holds.[6] *See State v. Young,* 89 Wn.2d 613, 625, 574 P.2d 1171, *cert. denied,* 439 U.S. 870 (1978) (this court may assume that where no authority is cited, counsel has found none after search).

Here, Veranth identified the substance in the object recovered from Harrell as smokeless or black gunpowder. The trial court found Veranth was an expert based on her specific training, background and expertise as a fire

---

[6]The out-of-state cases cited in the appellant's brief also do not require this result. In *State v. Van Arsdale,* 20 Ariz. App. 253, 511 P.2d 697, 699 (1973), the court held that the charge of possession of an explosive device was supported by sufficient evidence where the expert witness based his conclusion that the substance at issue was dynamite simply on the fact that he recognized it as such; there was no chemical analysis of any kind conducted. In *People v. Morse,* 2 Cal. App. 4th 620, 3 Cal. Rptr. 2d 343, 347-48 (1992), a burn test happened to be the method used to ascertain that the substance in one of two objects that appeared to be bombs was gunpowder. The court did not hold that such a test was *required.* Tests were not required to determine whether the second object was a bomb for a different reason: the object exploded, killing two of the investigating officers.

investigator. Veranth had also taken numerous FBI classes on explosive devices and testified that she was able to recognize a substance as smokeless or black gunpowder by sight, although she could not distinguish the two. She explained that the object recovered from Harrell consisted of gunpowder wrapped in a paper bag and layered with black electrical tape, describing it as "quite a piece of work."

John E. Decker, a bomb technician with the King County Police Department, described the object he examined on August 24 as a cigar-shaped device wrapped in black electrical tape with a fuse extending from one end. Based on Decker's training, expertise and familiarity with such substances, there was no doubt in his mind that the powdery substance it contained was smokeless gunpowder. To render it safe, he cut the device open and removed the gunpowder, although small amounts still adhered to the tape. He testified that the device had everything necessary to permit it to explode. Although he had not previously handled a device exactly like the one recovered from Harrell, he had handled many that were similar.

This evidence, viewed in the light most favorable to the State,[7] is sufficient to permit a rational trier of fact to conclude that Harrell possessed an explosive device filled with smokeless or black gunpowder "for a purpose inconsistent with small arms use or other lawful purpose." *See* RCW 70.74.010(3). Because the manner in which the gunpowder was packaged was inconsistent with small arms use or any other lawful purpose, there was no requirement that there be 50 pounds of it to violate the statute. That the appearance of the item had changed by the time of trial also does not change the result. The

---

[7]Harrell also apparently admitted that the item contained gunpowder in the statement he gave Veranth on the tape admitted as exhibit 31, to which the State repeatedly refers in its brief. Nothing in the record, however, reflects that exhibit 31 was ever designated for inclusion in the record on appeal. Even without the benefit of the evidence apparently before the trial court on the tape, the evidence in the record before us is sufficient to support the trial court's rulings.

change in appearance was supported by a logical and reasonable explanation and the testimony of the witnesses concerning its original appearance was consistent. The trial court's finding that Harrell was guilty of possession of an explosive device was supported by substantial evidence.

Affirmed.

GROSSE and WEBSTER, JJ., concur.

Reconsideration denied October 1, 1996.