### STATE of Missouri, Plaintiff–Respondent,

v.

### Kenneth GRAY, Defendant–Appellant.

#### No. 24958.

Missouri Court of Appeals,
Southern District,
Division Two.

March 31, 2003.

---

Rosalynn Koch, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Richard A. Starnes, Office of Attorney General, for respondent.

### KENNETH W. SHRUM, J.

Kenneth Gray ("Defendant") was convicted in a court-tried case of second de-gree murder (§ 565.021), armed criminal action (§ 571.015), and burglary (§ 569.160).[1] Defendant, who was just over sixteen years old at the time of the offenses, was certified for trial as an adult.[2] On appeal, Defendant asserts a confession he made to law enforcement officers was neither intelligently, nor voluntarily given; consequently, he argues that its admission in evidence was reversible error. We disagree. We affirm.

### FACTS

Viewed in the light most favorable to the judgment and the trial court's overruling Defendant's motion to suppress, *State v. Werner*, 9 S.W.3d 590, 593 (Mo.banc 2000), the facts are as follows: On October 27, 1999, Defendant lived with his mother, Marilyn Carroll ("Mother"), and stepfather on county road 410 in Dunklin County, Missouri. A neighbor, R.W. "Dub" Cooley ("Victim"), also lived on that road, approximately one quarter mile east of Defendant's home.

Sometime near noon on October 27, Defendant walked to Victim's house. After finding no one at home, Defendant used a brick to break a window and enter Victim's house. In doing so, Defendant cut his hands slightly and left blood at the scene. Defendant was still in the house when Victim unexpectedly returned. Initially, Defendant hid behind a couch. Upon finding the broken window, Victim called a friend and then his landlord. Next, he prepared to call the sheriff's office. As he did so, Defendant emerged from hiding, produced a handgun, pointed it at Victim, and asked him not to call.[3] When Victim

---

1. All statutory references are to RSMo 1994 unless otherwise stated.

2. Born August 4, 1983, Defendant was sixteen years, two and one-half months old when the subject crimes were committed.

3. Defendant had stolen the handgun approxi-

persisted in calling the sheriff, Defendant fired three shots at him, and two of those struck Victim causing him fatal wounds.

After Victim's friends found his body inside his home around 7:00 p.m. on October 27, the police were called and began their investigation. As part of their initial investigation, police contacted persons living on county road 410. Between 9:51 p.m. and 10:20 p.m. on October 27, officers Bullock and King talked with Defendant in their patrol car while parked in front of Defendant's home. Among other things, Defendant told officers he had been around Victim's house between 10:00 a.m. and 12:00 p.m. on October 27; that he had walked around the house and teased Victim's dogs, but had neither seen nor talked with Victim. Ultimately, Defendant told the officers he did not want to talk anymore by stating, "I think this interview is over." With that said, he stopped talking to Bullock and King. The officers then spoke briefly with Mother. She told them Defendant came home between 12:00 p.m. and 1:00 p.m.

At 11:45 p.m. on October 27, Cpl. Laramore of the highway patrol went to the Carrolls' home and asked Defendant and Mother to go with him to the sheriff's office to talk about the homicide. Laramore was accompanied by deputy juvenile officer Campbell and sheriff's deputy Daugherty. Defendant and Mother agreed to go, and Laramore took Defendant in his car, while Mother rode in Daugherty's vehicle. Campbell testified that Laramore's car only had room for three persons because "he had his hat . . . ,

a lot of books, things like that, in the back seat."

Upon reaching their destination, Cpl. Laramore assured Defendant he was not under arrest and could leave at any time. In response, Defendant answered, "[I] don't have anything to hide[.]" Thereon, juvenile officer Campbell gave Defendant a "juvenile" *Miranda* warning for a "felony offense."[4] Laramore testified Campbell read the warning to Defendant "line per line and made sure he . . . understood what he was reading." Campbell testified similarly, but added that he specifically asked Defendant if he wanted Mother present. After telling Campbell he "did not want his mother in there[,]" Defendant assured those present he understood his rights and wanted to make a statement. Thereon, Campbell had Defendant sign the *Miranda* form at 12:07 a.m. on October 28. Laramore and Daugherty then questioned Defendant until 12:55 a.m. During that period, juvenile officer Campbell was present, but did not participate in the questioning. As the questioning progressed, Laramore noted small cuts on Defendant's left palm and right index finger, and pictures were taken of these wounds.

At 12:55 a.m., Defendant told juvenile officer Campbell he would answer no more questions without Mother being present. The questioning stopped until Campbell went across the hall, got Mother, and brought her to the room where Defendant was being questioned.

Once Mother was present, highway patrol sergeant Rainey started questioning

---

mately two weeks earlier.

4. In addition to standard *Miranda* warnings, this included:

"4) The allegation against you is a felony offense[;] therefore a Law Enforcement Officer will ask all the questions."

"5) You may be certified to stand trial as an adult for this offense. If you are certified, then any statement you make may be used against you in the adult proceedings."

"6) You have the right to talk to a parent, guardian or custodian before any questioning and to have a parent, guardian or custodian present during such questioning."

Defendant. Deputy juvenile officer Campbell asked no questions. At one point, Sgt. Rainey asked Defendant to submit to a gunshot residue test, but Defendant would not consent.[5] The questioning ended at 2:30 a.m., and Defendant and Mother were returned to their home.

At approximately 11:00 a.m. on October 28, Sgt. Rainey and sheriff's deputy Bullock returned to the Carroll home with search warrants that authorized seizure of samples of Defendant's hair, blood, and fingernail scrapings. Mother testified that after the warrants were served on Defendant and her, the officers started toward their car with Defendant. She asked "where are you taking him[,]" and one of them answered, "We're taking him to the hospital and we'll bring him right back." When Rainey was asked what was said to Mother, he "didn't specifically recall" any conversation with her.

Sgt. Rainey and deputy Bullock first took Defendant to the sheriff's office and got hair and fingernail scrapings from him. Later, as they drove to the hospital for the blood sample, Defendant "mentioned that he had accidentally broken a window out of [Victim's] residence." Rainey responded by saying, "We [will] discuss that a little bit later after we [get] the blood sample."

After the blood was obtained, Rainey and Bullock took Defendant to the highway patrol zone office, arriving shortly after 2:00 p.m. Dunklin County juvenile officers Pemberton and Campbell were present. Before Defendant was questioned, Pemberton again gave Defendant a complete juvenile *Miranda* warning. This occurred between 2:25 and 2:29 p.m. The *Miranda* warning was given by reading each individual question to Defendant, asking him if he understood the question, and then "check[ing] them off" as Defendant answered. At the conclusion of the warnings, Pemberton asked Defendant if he understood his rights and wanted to make a statement. Defendant answered affirmatively. He did not request a lawyer or ask for a parent, but did ask to talk with Sgt. Rainey alone. Rainey explained that was not possible because at least one juvenile officer had to be present. At that point, deputy Bullock and deputy juvenile officer Campbell left the interview room, and Sgt. Rainey started the interview with only juvenile officer Pemberton in the room. Although Pemberton was present, he asked no questions and did not otherwise participate. In talking with Sgt. Rainey, Defendant said he had broken Victim's window earlier in the week (October 26) while throwing a stick and playing "fetch" with one of Victim's dogs, and it was possible he cut his hand while picking up the glass. Rainey ceased questioning Defendant between 3:30 and 4:00 p.m. At that point, Defendant had not confessed to killing Victim.

Around 5:15 p.m., another officer (Sgt.Sanders) entered the room and began questioning Defendant. Sanders was by himself, except for juvenile officer Pemberton. As Sgt. Sanders read from reports of Defendant's previous interviews with officers, he (Sanders) noticed Defendant was no longer calm; he had become increasingly nervous; and he finally said, "I was scared." When Sanders asked what he meant, Defendant confessed to breaking the east window of Victim's home with a brick, entering the house armed with a handgun, and later shooting Victim when Victim unexpectedly returned and found Defendant in his house.

Defendant then agreed to have his statement videotaped. Before this was done,

---

**5.** Despite Defendant's refusal, the test was made. The trial court, however, suppressed the results of the gunshot residue test and did not allow that in evidence.

juvenile officer Pemberton again gave a juvenile *Miranda* warning to Defendant. After Defendant acknowledged verbally that he understood his rights and wanted to give a statement, he confirmed that by signing the waiver form. He then confessed to the crimes as outlined above.

After the juvenile court ordered Defendant tried as an adult, the charges lodged against him included first degree murder. Later, the information was amended to second degree murder in exchange for Defendant's waiver of his right to jury trial and consent to submit his case on a stipulated set of facts. The trial court found Defendant guilty and imposed sentence. This appeal followed.

## DISCUSSION AND DECISION

Defendant's single point on appeal asserts that his confession was neither intelligently, nor voluntarily given, and its admission violated his constitutional rights to due process, a fair trial, and to be free from self-incrimination. In making his argument, Defendant concedes that the record supports the trial court's finding that interrogating officers did not threaten Defendant, Defendant did not ask to have a parent present on the evening of October 28, and the juvenile officer did not propound any questions to him. Moreover, Defendant acknowledges the State made "a *prima facie* case of voluntariness by showing that at all stages of interrogation [Defendant] was advised of his constitutional rights and ... no physical force, threats, or coercive tactics were used to obtain the confession."

Even so, Defendant insists special circumstances in this case compel a finding that the State's *prima facie* showing of voluntariness was fully rebutted, that Defendant did not understand or intelligently waive his rights, and the court committed reversible error when it ruled otherwise.

Specifically, Defendant claims the following as special circumstances in his case: He was only sixteen years old; he was taking Prozac and other medications for depression, anxiety, and attention deficit; he had an IQ of 73; he was not told Mother was willing to help him; he "perceived himself as being assaulted;" "the investigation lasted for hours and involved three different officers after he was taken on a search warrant and then taken for interrogation without being advised he was free to leave;" he had difficulty sleeping; and "juvenile officers ... did nothing but merely recite his rights without assuring that he understood them."

■■ The condition of infancy, standing alone, is not sufficient to invalidate an otherwise competent waiver of constitutional rights. *State v. Pierce*, 749 S.W.2d 397, 402[3] (Mo.banc 1988); *State v. Burris*, 32 S.W.3d 583, 587 (Mo.App.2000). "Adolescents may voluntarily waive their rights." *Id.* at 587[4]. Whether a juvenile in custody has made an intelligent, understanding, voluntary waiver of his or her constitutional rights is determined by examining the totality of the circumstances surrounding the giving of the statement. *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2571–72, 61 L.Ed.2d 197 (1979); *State v. Sinderson*, 455 S.W.2d 486, 493–95 (Mo.1970). Voluntariness of a juvenile's statement, as with an adult's confession, is determined on a case-by-case basis. *State v. Clements*, 789 S.W.2d 101, 105 (Mo.App. 1990).

■■ Minority is just one of many factors to be considered when voluntariness of a confession is challenged. *Pierce*, 749 S.W.2d at 402[3]; *Burris*, 32 S.W.3d at 587. Other factors include the accused's psychological age, his or her previous court experience, education level, intelligence ranking, and unusual susceptibility to coercion. *Clements*, 789 S.W.2d at

105[4]; *State v. White,* 494 S.W.2d 687, 690 (Mo.App.1973).

Here, as noted above, Defendant was sixteen years, two and one-half months old when he confessed to killing Victim. As such, he was only seven and one-half months from being charged initially as an adult. Although Defendant argues he was not "street wise" and had no criminal record or history of juvenile court involvement, the record reflects he had familiarity with the criminal justice system. A report by Dr. Meehan of Hawthorne Children's Psychiatric Hospital (which is in evidence) recounted numerous instances where juvenile officers and the Malden police were either contacted or called to the school because of Defendant's disruptive behavior there, i.e., fighting with a school principal, disrupting classes, causing fights, leaving the classroom without permission, refusing to leave when requested, and school absences. On at least two occasions, the police took Defendant in custody at school, reported that fact to juvenile officers, and then turned Defendant over to Mother. Moreover, Mother reported to Dr. Meehan that in the summer of 1999, a policeman took Defendant into custody, questioned him about a burglary, and then took him to the juvenile detention facility where he stayed until the next day.

A more compelling indication of Defendant's familiarity with the criminal justice system and that he acted knowingly and voluntarily in giving his confession is gleaned from his responses to law enforcement officers as their investigation progressed. When first questioned by officers Bullock and King on October 27, he terminated the interview by telling them "he didn't want to talk any more." Defendant acted thusly even though Bullock and King had not given him a *Miranda* warning. This hardly bespeaks a person so

unsophisticated, unintelligent, and uninformed that he could not understand the context of what was occurring.

This view is strengthened by Defendant's conduct after he was given juvenile *Miranda* warnings. The first *Miranda* warning was given him near midnight on October 27. After the warning, Defendant assured the juvenile officer he understood and wanted to waive his rights, and he declared he did not want Mother present. After giving officers what he apparently believed were non-inculpatory facts, Defendant decided to exercise one of the rights about which he had been told, namely, he asked to have Mother present. He also refused to consent to the gun powder residue test. When Defendant was next in custody (the afternoon of October 28), he was given a second juvenile *Miranda* warning. Again, he asserted he understood his rights and declined to request a lawyer or the presence of Mother. He asked, however, that any questioning be done exclusively by Sgt. Rainey, and his request was honored to the extent possible. Defendant's invocation of his rights, refusal to consent to the gunpowder residue test, and his assertion of control over the interview process belies his claim that he did not "truly understand what was at stake" and did not know he could invoke his rights and refuse to speak. *See, e.g.,* *State v. Ouk,* 516 N.W.2d 180, 185 (Minn. 1994) (holding that a 15–year–old was of suitable intelligence and maturity to validly waive *Miranda* rights, specifically focusing on the fact that the juvenile had been advised of his rights on three prior occasions and had once asked for an attorney); *State v. Toste,* 198 Conn. 573, 504 A.2d 1036 (1986) (holding an accused with a sixth or seventh grade education who testified at suppression hearing that he had asked for a lawyer—although disbelieved

by the trial court—indicated his familiarity with his rights).

In so stating, we do not ignore Defendant's claim that low scores on a juvenile's aptitude tests are factors to be considered in deciding if his or her confession was knowingly and voluntarily given. Low IQ test scores, however, do not necessarily render a confession inadmissible. *See State v. Harrell,* 83 Wash.App. 393, 923 P.2d 698, 703 (1996). Here, Defendant could read, do math, and was functioning at a ninth grade level. Although Defendant's test scores (IQ of 73–75) showed him to be in the borderline range of intellectual development, his verbal IQ test results were always higher (78 to 84). In Dr. Meehan's report, he noted that Defendant's "achievement scores, academic performance and overt presentation did not always appear commensurate with [a 73–75 I.Q.] level of intellectual functioning." This report continued:

> "Achievement scores and academic performance are variable and may reflect his emotional or psychological function, with higher levels of anxiety impacting his performance negatively. His reading ability and overt presentation would suggest that his actual intellectual potential is higher."

Defendant's initial efforts to explain away blood evidence that connected him with the broken window at Victim's house, his assertion of his rights on separate occasions, and his overt performance during the videotaped confession, does not bespeak a person of such "dull" intellect that he was incapable of understanding his rights, as he now claims.

■ In expressing this view, we have considered, but are unpersuaded that Defendant's history of depression, anxiety, and attention deficit disorder is a factor that weighs heavily in favor of finding involuntariness. The record shows Defendant was treated effectively for these conditions. For instance, during a nine-day hospitalization in November 1998, Defendant was treated for these conditions and discharged after he showed "significant improvement." After the hospitalization, Defendant was seen regularly and was successfully treated by physicians specializing in mental health care. For instance, during a September 13, 1999, visit with Dr. Jerry Wessel, Defendant's only complaints were "nervous," "not sleeping much," and "used to have panic attacks." The physician who saw him on that date observed Defendant's "affect" was "bright," his thought process was logical, and his speech flow was normal. This is consistent with post-crime evaluations of Defendant. Specifically, during evaluation at Hawthorne Hospital in December 1999, Defendant "denied experiencing any panic attacks lately." The Hawthorne psychological-test report of Defendant described his "thought processes ... as logical and sequential."

The record also refutes Defendant's contention that medications he was taking should be an important factor in analyzing the voluntariness of his confession. He simply did not present evidence to support such an assertion. When he confessed, Defendant was using two medications, Klonopin and Prozac. Defendant, however, presented no evidence from any source, including his own testimony, that these medications had side effects or that taking them impaired his ability to make an intelligent, understanding, and voluntary waiver of his constitutional rights. This is understandable since Defendant told Dr. Meehan at Hawthorne Hospital that Klonopin helped his nerves, and Mother asserted that Prozac "was best for treating his panic attacks, anxiety and sleep problems." Although Mother claimed Defendant's medications were "too strong from him" and made him "light-headed and

[caused] dizzy spells[,]" Defendant did not make that claim. Assuming arguendo that there were instances when the medications affected Defendant in this manner, there is no evidence he was experiencing those problems while being interrogated on the afternoon of October 28, 1999. In sum, the evidence supports a finding that Defendant's medicines aided him in making an intelligent, understanding, and voluntary waiver of his constitutional rights, rather than impairing his ability to do so.

■■■■ Next, we consider Defendant's claim that "he was not informed his mother was willing to help him." Section 211.059.1(3) gives a juvenile the "right to have a parent present during questioning." *Burris,* 32 S.W.3d at 589. This is legislative recognition of what Missouri courts have long asserted, namely "juveniles may not be able to assess their rights adequately[;]" consequently, "they must be allowed to confer with a friendly adult." *State v. Barnaby,* 950 S.W.2d 1, 3[5] (Mo.App. 1997). "The rationale is that an adult's presence helps to insure that the juvenile understands the consequences of his confession and his rights." *Id.* This, however, is not a case in which a juvenile suspect was picked up without his parent's knowledge of the crime or his arrest. By 10:20 p.m. on October 27, Mother knew of Victim's death, and that officers had talked with her son about the homicide. Between 10:20 p.m. (when officers left Defendant's home) and 11:45 p.m. (when they returned and asked Defendant to go with them), Defendant and Mother were at their home and could have conferred privately. They had another opportunity to consult each other once Mother entered the interrogation room at 12:55 a.m. at Defendant's request. After the first *Mirandized* interrogation ended at 2:00 p.m., Defendant was at home with Mother for approximately nine hours before the search warrant was served. Clearly, Defendant and Mother had ample opportunity to confer prior to the second *Mirandized* interrogation. *See People v. Brown,* 235 Ill.App.3d 479, 176 Ill.Dec. 492, 601 N.E.2d 1190, 1198 (1992). More than that, Defendant presented no evidence that Mother had the ability to advise him of his rights and the consequences of waiving them. *See McIntyre v. State,* 309 Md. 607, 526 A.2d 30, 39 (1987). Under the circumstances, Defendant's complaint that "he was not informed his mother was willing to help him" rings hollow.

■■■ Next, we turn to Defendant's novel argument that his perception of "having been assaulted" during his interrogation was a compelling circumstance that the trial court failed to consider. Although Defendant explicitly acknowledges that "no physical forces, threats, or coercive tactics were used to obtain [his] confession[,]" he claims his psychological makeup and other "deficiencies and limitations" led him to have that perception. Because of the perception of assault—admittedly not a reality—Defendant asserts his statement was coerced, involuntary, and must be suppressed.

There are at least two reasons why this argument fails. First, as noted earlier, this record contains evidence that refutes Defendant's claim that he suffered from intellectual difficulties, psychological impairments, or drug-induced problems that precluded him from knowingly and intelligently waiving his constitutional rights. Second, the case of *Chaney v. Wainwright,* 561 F.2d 1129 (5th Cir.1977), succinctly explains why Defendant's "perception of assault" argument is fundamentally flawed:

"If an intentional and truthful statement must be deemed to be involuntary, merely by reason of imaginary dangers conjured up by an apprehensive suspect,

a greater burden would be placed on law enforcement than any which judicial solicitude for persons charged with crime has hitherto created. There would be no objective standards for determining voluntariness, and no limit but the ingenuity of the defendant to the grounds for invalidity of confessions."

*Id.* at 1132.

■ Defendant also complains he was subjected to, a lengthy interrogation by a number of officers without being advised he was free to leave. According to Defendant, he "was given the picture that the authorities would just call in reinforcements until he finally gave up." He insists these "facts" support his claim of involuntariness. Once again, the record refutes Defendant's factual premise.

During the afternoon interrogation on October 28, Defendant was questioned at most for 90 minutes by Sgt. Rainey and 71 minutes by Sgt. Sanders before he confessed. These were one-on-one interrogations with only the juvenile officer present. The videotaped interview lasted eighteen minutes (starting at 6:26 p.m. and ending at 6:44 p.m.), and only one officer questioned Defendant during its taking. At his suppression hearing, Defendant never claimed that the length of the interrogation or the procedure used caused him to be tired, sleepy, or otherwise impaired to the point he succumbed to the interrogator's pressure. When asked at the suppression hearing how he felt "physically" as the officers questioned him, Defendant answered: "Scared. Nervous. I panicked."

These facts clearly distinguish this case from *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948) (where a fifteen-year-old defendant confessed after being questioned for five consecutive hours at night by relays of police officers without contact with his parent), and *Gallegos v. State of Colorado,* 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962) (where a four-

teen-year-old adolescent, who had no contact with a parent or adult relative, confessed after being held incommunicado for five days). We find no basis in this record for concluding that the interrogation length, or the number of officers involved, or the procedure followed, were significant circumstances that support Defendant's claim of involuntariness.

■ Finally, the record contradicts Defendant's claim that juvenile officers "did nothing but merely recite his rights without assuring that he understood them." The record shows that on three separate occasions, the juvenile officers represented Defendant's interests by (a) reading him the *Miranda* warning about his constitutional rights, (b) advising him of his statutory right to have his parents present before being questioned, (c) informing Defendant that he might be certified to stand trial as an adult for the offense being investigated, (d) pointing out that law enforcement officers would do the questioning, and (e) telling him that any statement he might make could be used against him in adult proceedings. With scrupulous care, the juvenile officers asked Defendant if he fully understood his constitutional rights, and he always answered affirmatively. Moreover, a juvenile officer was present as an observer during every "in-custody" interrogation of Defendant. In sum, the juvenile officers did warn Defendant of his rights, made sure he understood his rights, saw to it that his rights were accorded to him, and made it clear that the questioning authorities were operating as his adversaries rather than his friends. *State v. Wright,* 515 S.W.2d 421, 430–31[4] (Mo.banc 1974). Their conduct does not indicate involuntariness as Defendant claims. If anything, it supports the finding that his statement was given voluntarily and knowingly.

We have reviewed the record on appeal which includes the challenged videotaped

statement and the facts recounted above. The videotape reveals Defendant was physically mature, and his demeanor belies his claim that his confession was "the product of ignorance of rights" and of "adolescent fantasy, fright or despair." We do not ignore that Defendant appears to cry or sob occasionally during the videotaped statement. However, "[t]ears alone do not wash out a voluntary confession." *Clements*, 789 S.W.2d at 107. There is sufficient evidence to support the trial court's finding that Defendant's statement was voluntary. The videotape alone is persuasive evidence that Defendant knowingly and voluntarily waived his juvenile *Miranda* rights. *See Barnaby*, 950 S.W.2d at 4. The trial court had the opportunity to view the statement and to pass on the credibility of witnesses. We hold that the trial court did not err in holding that the State sustained its burden of showing that the statement was given voluntarily under the totality of the circumstances standard.

The judgment of conviction and sentence is affirmed.

PREWITT, P.J., and PARRISH, J., concur.