**STATE of Missouri, Respondent,**

v.

**Vincent GREER, Appellant.**

No. ED 83662.

Missouri Court of Appeals,
Eastern District,
Division Five.

Feb. 1, 2005.

Application for Transfer to Supreme Court
Denied March 23, 2005.

Application for Transfer Denied
April 26, 2005.

Craig Johnston, Columbia, MO, for appellant.

Deborah Daniels, Linda Lemke (co-counsel), Jefferson City, MO, for respondents.

## OPINION

GLENN A. NORTON, Presiding Judge.

Vincent Greer appeals the judgment entered on his convictions for murder in the first degree, assault in the first degree and two counts of armed criminal action. We affirm.

### I. BACKGROUND

One morning shortly after his fifteenth birthday, Greer hid behind a sofa in the basement. When his father came into the room, Greer shot him with a semi-automatic rifle, causing him serious injury. As Greer's mother started to come downstairs, his father yelled for her to go back upstairs and call 911. Greer chased after her, still holding the gun. When he got to

the top of the stairs, the door was locked. He ran back down the steps, out the garage door and up onto the deck—stopping to dislodge a bullet that had jammed the gun—and then broke the glass on the back door. Greer walked into the kitchen, saw his mother was hiding behind a bar stool and shot her in the back of the head. She later died from the wound. Greer's father came upstairs, got the gun from Greer and held him down until police arrived.

Greer was arrested, provided a *Miranda* warning [1] and transported to the juvenile detention center. Greer's uncle was brought in and was present when the deputy juvenile officer again advised Greer of his rights under *Miranda* and of his rights under the state juvenile code. Greer waived his rights and confessed to shooting both of his parents. After Greer was certified to stand trial as an adult, Greer again waived his rights and made similar statements. Greer's pre-trial motion to suppress all of these statements was denied, as were his objections to their admission at trial.

The jury found Greer guilty and assessed punishment as follows: life imprisonment without probation or parole for his mother's murder; life imprisonment on the armed criminal action count associated with the murder; ten years' imprisonment for assaulting his father; and three years' imprisonment on the armed criminal action count associated with the assault. The court sentenced Greer to these terms of imprisonment, ordering the sentence on the first armed criminal action count to run consecutively to the sentence for murder. The sentences for the assault and associated armed criminal action count were ordered to run concurrently with the other sentences. After an earlier trial on these charges, the court had ordered the sentences on all four counts to run concurrently.[2] The court noted that its decision to run the sentences the way it had after this re-trial was based on the fact that the second jury had imposed "a considerably greater sentence" on the first armed criminal action count than had the first jury— life imprisonment versus twenty years' imprisonment—and "a considerably lesser sentence" on the second armed criminal action count.[3]

## II. DISCUSSION

### A. Deliberation

 Greer argues that the trial court erred in overruling his motion for judgment of acquittal at the close of all of the evidence because the State failed to prove that he deliberated about killing his mother. We disagree.

 When reviewing the sufficiency of the evidence to support a criminal conviction, this Court does not act as a "super juror" with veto powers. *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998). We give great deference to the jury and do not ask ourselves whether we believe that the evidence at trial established guilt beyond a reasonable doubt. *State v. Cartwright*, 17 S.W.3d 149, 152 (Mo.App. E.D. 2000). Instead, the question is whether

---

1. *See Miranda v. Arizona*, 384 U.S. 436, 475–76, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. The convictions resulting from the first trial were overturned on appeal due to the State's discovery violations. *State v. Greer*, 62 S.W.3d 501 (Mo.App. E.D.2001).

3. Although in its remarks about the "considerably lesser sentence" the court actually referred to count III—the assault count—both juries recommended ten years on that count. As Greer concedes, the court likely misspoke and meant to refer to the second armed criminal action count, for which the first jury recommended seven years' imprisonment and the second jury recommended three.

"any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Chaney*, 967 S.W.2d at 52. In answering that question, we view the evidence in the light most favorable to the verdict, give the State the benefit of all reasonable favorable inferences and disregard all contrary evidence and inferences. *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993).

 Murder in the first degree requires proof of deliberation. Section 565.020.1 RSMo 1994.[4] "Deliberation" is "cool reflection for any length of time no matter how brief." Section 565.002(3). Ordinarily, deliberation is proved by the circumstances surrounding the crime; it may be inferred, but must be proven beyond a reasonable doubt. *State v. Glass*, 136 S.W.3d 496, 514 (Mo. banc 2004). "Proof of deliberation does not require proof that the defendant contemplated his actions over a long period of time, only that the killer had ample opportunity to terminate the attack once it began." *State v. Johnston*, 957 S.W.2d 734, 747 (Mo. banc 1997) (internal citations omitted).

The evidence to support the jury's finding of deliberation was substantial. First, Greer encountered several roadblocks as he chased after his mother, which provided him ample opportunity to terminate the attack. The basement door was locked, so he went outside and around to the back of the house. His gun was jammed, but he dislodged the bullet and continued on into the kitchen. The mere fact that it took some amount of time for Greer to reach his mother before he shot her supports the reasonable inference that he reflected for at least that time. *See State v. Clemmons*, 753 S.W.2d 901, 906 (Mo. banc 1988) (evidence that defendant took a few steps toward victim before stabbing victim gave rise to reasonable inference that defendant reflected for at least the amount of time it took to reach victim).

Second, Greer's statements to the police supported a finding that he had deliberated about the murder. Greer claimed at various points during the interview that he did not know what made him shoot his parents, that he was not thinking anything when he shot his mother, that he "just snapped" and that he could not remember everything that happened. But he also stated that he thought about running after he shot his father, "[b]ut then I got inside and I was like I should get them before they call the cops." Greer also admitted that he had thought about shooting his parents before:

Q: Okay. Had you thought about doing this like last night or just something this morning?

A: Well, there had been thoughts of it, not, I never thought I was serious and then whenever I started really thinking about it I was like, how could you be so stupid.

Q: Right. And that's today, you're thinking about that.

A: And last night.

Q: Last night.

A: Thinking about it, you know.

Q: Uh huh.

A: How could I be stupid enough to think about it.

* * * *

Q: What made you think ... what made you think about this? I mean, did you see something on TV or did you finally say I've had it or?

A: Well, actually the first thought I had about it was yesterday in school. One of my teachers was telling us about how he used to be a DJO. He

4. All statutory references are to RSMo 1994.

used to track down juveniles that killed their parents and stuff.

Q: Uh huh.

A: I just got a weird thought in my head.

Q: Right.

A: And I couldn't get it out.

Q: You went to bed last night even thinking about it?

A: I didn't hardly sleep at all.

Q: Didn't hardly sleep. So you were really thinking about it then?

A: Uh huh.

The State is entitled to the reasonable inference that by "it" Greer meant killing his parents.

Greer argues that there is other evidence that supports a finding that Greer did not deliberate. He points to two psychologists' conclusions that Greer could not have deliberated on this murder and to his father's testimony that when he came into the kitchen after Greer's mother had been shot, Greer "looked like he was in a world of his own" and had a "glazed look." The jury was free to disbelieve this testimony, however, and to the extent this evidence is contrary to the jury's verdict, we are to disregard it in our review of the sufficiency of the evidence. *See State v. Porter*, 640 S.W.2d 125, 127 (Mo. banc 1982); *Grim*, 854 S.W.2d at 405.

Contrary to Greer's contentions, we need not resort to speculation to find sufficient evidence of deliberation in this case. The trial court did not err in overruling his motion for judgment of acquittal. Point denied.

**B. Juvenile Confession**

■ Greer argues that the court plainly erred [5] in denying his motion to suppress and admitting at trial his pre-certification confession because the statements were involuntary and the waiver of his rights to counsel and to remain silent was not knowing or intelligent. We disagree.

■ After an individual has been advised of his rights in accordance with *Miranda*, no statement he makes may be used against him unless he makes a knowing, intelligent, understanding and voluntary waiver of those rights. *State v. Pierce*, 749 S.W.2d 397, 402 (Mo. banc 1988). The State carries the burden of proving that the confession was voluntary. *State v. Jones*, 699 S.W.2d 525, 527 (Mo. App. E.D.1985). We view the evidence pertaining to the admissibility of the confession in the light most favorable to the trial court's ruling. *State v. Simmons*, 944 S.W.2d 165, 173 (Mo. banc 1997). Conflicts in the evidence are for the trial court to resolve, and this Court defers to the trial court's superior position from which to assess credibility. *Id.*

■ Whether a confession is voluntary depends on "whether the totality of the circumstances created a physical or psychological coercion sufficient to deprive the defendant of a free choice to admit, deny or refuse to answer the examiner's questions." *Id.* There is no evidence of physical coercion in this case. In determining whether a confession resulted from improper mental coercion, we consider the defendant's age, experience, intelligence, gender, education and any infirmity or unusual susceptibility to coercion, but no one factor is dispositive. *Id.* Similarly, whether a waiver is knowing and intelligent depends on the facts and circumstances of the case, and our review is based on the totality of the circumstances, taking into account the background, experience and conduct of the defendant. *State v. Bucklew*, 973 S.W.2d 83, 90 (Mo. banc 1998).

5. This claim of error was not included in Greer's motion for new trial.

Although juveniles may voluntarily waive their rights, courts emphasize that a juvenile's confession requires "special caution." *Pierce,* 749 S.W.2d at 402; *see also generally Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948) *and Gallegos v. State,* 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962). The juvenile's age is not a controlling factor, but it is a significant consideration among the totality of the circumstances. *See Pierce,* 749 S.W.2d at 402. Other factors include the defendant's psychological age, previous court experience, education, intelligence and unusual susceptibility to coercion. *State v. Gray,* 100 S.W.3d 881, 886 (Mo. App. S.D.2003). We must consider not just whether the confession was coerced, " 'but also that it was not the product of ignorance of rights or of adolescent fantasy, flight or despair.' " *Pierce,* 749 S.W.2d at 402 (quoting *Application of Gault,* 387 U.S. 1, 55, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)).

The totality of the circumstances here show that Greer's waiver was knowing and intelligent and his confession voluntary, even in light of his age. Greer does not dispute that the deputy juvenile officer read Greer each of his rights. Namely, Greer was told that he had the right to have a parent, guardian, or custodian present; that he had the right to remain silent; that he had the right to counsel; that anything he said would be used against him in juvenile court; that he could be certified to stand trial as an adult; and that, if certified, anything he said would be used against him in adult court.[6] After each right was read to him, Greer explained it back to the juvenile officer in his own words and indicated that he understood each. Greer initialed each right as set out on the waiver form and signed the form, indicating that he understood the rights and was willing to make a statement. His uncle signed the form, indicating that the waiver of rights was presented to Greer in his presence; the juvenile officer and the interrogating officers also signed the form, attesting that Greer had been read the waiver of rights, understood it and affirmed his signature in their presence. These facts show that his waiver was knowing and intelligent. *See State v. Gilbert,* 103 S.W.3d 743, 750–51 (Mo. banc 2003) (knowing and intelligent waiver is normally shown by testimony that defendant was read rights, asked whether understood and gave affirmative response). Moreover, it is undisputed that Greer was of at least average intelligence, read along and paid attention during the reading and waiving of his rights and that he was calm, quiet, polite and coherent during the interview. He responded to questions appropriately and seemed to understand what was happening. This evidence belies Greer's claims that his age, depression, shock from the incident and inexperience with the court system affected his ability to understand his rights, knowingly and intelligently waive them and voluntarily make a statement.

Greer contends that questioning by an officer at the crime scene "foreshadowed" later errors during the interrogation at the juvenile detention center. At the scene,

---

**6.** The record refutes Greer's claim that the juvenile officer informed him that being certified as an adult only meant going to an adult jail. In any case, Greer does not indicate what other information about certification should have been provided, nor does it appear that the juvenile officer was required to advise Greer about anything else. *See generally* Rule 122.05 (1997) (requiring juvenile be advised of right to remain silent, right to counsel and right to stop talking once he starts, that whatever he says to juvenile officers and court personnel can be used "in certain later proceedings" and that whatever he says to police can be used against him if prosecuted as adult).

Greer was advised of his rights, and the officer gathered some background information (name, date of birth, address, phone number, etc.). The officer asked some additional questions even after learning that Greer was a juvenile, relating to securing the home (who else was there and whether there were any other weapons in the house) and determining the extent of injuries to Greer and others (including how blood, also observed on Greer, had gotten in Greer's bedroom). We find nothing about this initial questioning coercive or detractive from the voluntariness of Greer's later confession. Greer also suggests that he was misled because he was only told that the offense was assault when the officers should have known that his mother was about to die from the wound Greer inflicted and the charge, therefore, was likely to be murder. At the time of questioning, however, the officers believed mother was alive, and, thus, informing Greer that the offense was assault was not a coercive tactic.

Greer's knowing and intelligent waiver included a waiver of his statutory right to be advised that he has "the right to have a parent, guardian or custodian present during questioning." *See* section 211.059.1(3).[7] After the juvenile officer advised Greer of his right to have a parent, guardian, or custodian present, Greer responded that he understood that he had the right to have someone present and that his uncle was there. Greer's response indicates that he waived the right to have his parent, guardian, or custodian present or felt that the right was satisfied by his uncle's presence.[8] Now Greer claims that his uncle

was not a sufficiently friendly adult because he did not believe he was there to advise or protect Greer and did not even speak to Greer until the end of the interrogation. This argument assumes that, despite having waived the statutory right to have a parent present, Greer still was entitled to confer with some other friendly adult. Even if that is true, his uncle's presence sufficed.

Section 211.059.1(3) "is a legislative recognition of what Missouri courts have long asserted, namely juveniles may not be able to assess their rights adequately; consequently, they must be allowed to confer with a friendly adult." *Gray,* 100 S.W.3d at 889 (internal quotation marks, citations and brackets omitted). This stems from the notion that an adult friend or lawyer can give a juvenile "the protection which his own immaturity could not" and put the juvenile on "less unequal footing with his interrogators." *Gallegos,* 370 U.S. at 54, 82 S.Ct. 1209. "[A]n adult's presence helps to insure that the juvenile understands the consequences of his confession and his rights." *State v. Barnaby,* 950 S.W.2d 1, 3 (Mo.App. W.D.1997); *see also Jones,* 699 S.W.2d at 527–28; *State v. Burris,* 32 S.W.3d 583, 589 (Mo.App. S.D. 2000). The juvenile is not, however, entitled to get any particular advice from the adult. *See Burris,* 32 S.W.3d at 589; *see also Barnaby,* 950 S.W.2d at 3. Rather, this right is usually satisfied when the adult is present during the reading of rights and questioning and is not antagonistic to the child's interest, such that the juvenile could look to that person for advice.

---

7. Greer's point relied on does not even include a claim of error relating to the waiver of this right, only as to the waiver of his rights to counsel and to remain silent.

8. The record reflects that at the time of the interrogation, Greer's mother and father were unavailable to attend the questioning or confer with Greer because they were in the hospital being treated for the injuries Greer had inflicted, but also that Greer's father was aware Greer had been taken into police custody.

For instance, in *Gray,* the juvenile defendant claimed that his confession was involuntary because, although his mother was present during the interrogation, he was not told that she was willing to help him. 100 S.W.3d at 889. The court found, however, that he had "ample opportunity to confer" with his mother at their home before the challenged interrogation (after having been initially questioned by the police) and again after his mother entered the interrogation room. *Id.* Likewise, in *Barnaby,* the juvenile defendant contended that, although his mother was present during the interrogation, she was not "friendly" because she did nothing to protect his rights and, thus, her presence was a "mere formality." 950 S.W.2d at 3. But the court found that the officers did nothing to exclude the mother from the proceeding and, in fact, encouraged her participation, making certain she understood that the warnings had been given. *Id.* at 4. Although the mother only half-heartedly acknowledged that she understood those rights and demonstrated that she was not a "willing participant," the confession was not involuntary. *Id.* "Nothing in the record indicates that [the juvenile] was precluded by the authorities from conferring with his mother." *Id.* In these cases, it was irrelevant that the juvenile and adult did not take advantage of the opportunity to confer or that the adult did not actually provide the juvenile any advice. Rather, it is the *opportunity* for the juvenile and adult to confer that is critical. That opportunity was provided to Greer.

▆▆▆▆ Moreover, the record reflects that Greer's uncle was "friendly" to Greer. A "friendly adult" is one whose mindset is not antagonistic or adverse to the juvenile.

*Burris,* 32 S.W.3d at 589. Naturally, the adult must also have some relationship with the juvenile—that is, the adults must know the child well enough that it is possible for him to offer the child "meaningful advice" or "concerned help" should the need arise. *State v. Tolliver,* 561 S.W.2d 407, 409 (Mo.App.1977) (juvenile officers with no information about juvenile or circumstances of alleged crime were not considered "adult friends"). Uncle testified that he was married to Greer's father's sister and that he had known Greer since he was born. When the officer at the hospital was looking for an adult relative to attend Greer's interrogation, the uncle volunteered. Despite indicating that he "had no feelings one way or another" as to whether he was there to protect Greer, did not understand that he was there to advise Greer and did not intend to protect Greer, he also stated that he was not angry at Greer about the shootings. Uncle was in a state of shock from the incident and said he had no feelings at all. No hostility was observed between Greer and his uncle, and they were seen greeting each other "as friends." Greer apparently believed that his uncle was friendly towards him because he indicated that his uncle was there instead of a parent and did not object to his presence.[9] Moreover, in the uncle's observation, Greer did nothing that would have led him to believe that Greer did not understand what was going on, implying that he never saw the need to advise Greer. Although he also admitted that it was possible he had told someone something to the effect that if Greer ever "got out," he should never come around his home, we defer to the trial court's resolution of this and other conflicts in evidence and to its credibility determinations. *See Simmons,*

9. The juvenile officer also testified that Greer told her his uncle "was in there representing me, reading him his Rights, making sure that he helped him to understand it also." Although this testimony is somewhat vague, it tends to further support the conclusion that Greer believed his uncle was a friendly adult.

944 S.W.2d at 173. This record supports a conclusion that the uncle was not antagonistic towards or adverse to Greer's interest. His presence, therefore, provided Greer an opportunity to confer with a friendly adult.

The presence or absence of a friendly adult is just one of the factors we consider when reviewing the totality of the circumstance, although it is one "of great importance." *Tolliver*, 561 S.W.2d at 409. The totality of the circumstances of this case are wholly and clearly distinguishable from those circumstances attending the confessions of juveniles in cases like *Haley, Gallegos* and *Pierce*. The children in those cases were held or questioned without communication with any adult for lengthy periods until they confessed, and their confessions were, therefore, deemed involuntary. *See Haley*, 332 U.S. at 598, 68 S.Ct. 302 (fifteen year-old was questioned through the night by relays of police without a friend or lawyer present); *Gallegos*, 370 U.S. at 54, 82 S.Ct. 1209 (fourteen year-old was detained five days without access to his mother, lawyer, or adult advisor); *Pierce*, 749 S.W.2d at 403 (fifteen year-old, arrested as adult and having initially asserted right to remain silent on advice of counsel, was held for several days without communication with an attorney or family member, "sobbing in apparent fear and despair"). Here, the interrogation lasted only a couple of hours, Greer was not prevented access to his family and he had his uncle with him the entire time. These facts, plus the evidence discussed above tending to show that Greer understood everything that was happening, demonstrates that Greer knowingly and intelligently waived his rights and confessed voluntarily. It was not error, therefore, for the court to deny his motion to suppress and admit this confession.

Point denied.

## C. Sixth Amendment Right to Counsel

Greer argues that his Sixth Amendment right to counsel was violated because the officers who interviewed him after he was certified knew that he had a lawyer and, therefore, the waiver of his rights during that interview was ineffective. This claim also was not preserved for review, but we find no error, plain or otherwise, because Greer's Sixth Amendment right to counsel had not yet attached. The Sixth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against an accused by way of a formal charge, preliminary hearing, indictment, information, or arraignment. *State v. Washington,* 9 S.W.3d 671, 675 (Mo.App. E.D.1999). Once the right has been invoked, subsequent waiver during a police-initiated custodial interview is invalid. *Id.* Here, proceedings had not begun. Greer had not been indicted or charged in the adult court at the time of this interview. The indictment was filed February 5, 1998; the interview occurred several weeks earlier on January 8th (according to trial testimony and waiver form) or January 18th (according to suppression hearing testimony). Moreover, any Sixth Amendment right to counsel that had attached in the juvenile proceeding did not transfer after Greer was certified as an adult. *See id.*

Point denied.

## D. Sentencing Error

Greer argues that running the sentences on the murder count and the first armed criminal action count consecutively—instead of concurrently as it had after his first trial—violated Greer's due process rights under *North Carolina v. Pearce,* 395 U.S. 711, 726, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). To prevent judicial vindictiveness by trial courts against de-

fendants who take successful appeals, the Supreme Court in *Pearce* held that "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear" and must be based upon "objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." *Id.* The *Pearce* rule is grounded in the constitutional right to due process. *See id.* at 725. Constitutional errors do not automatically require reversal and are subject to the harmless error analysis. *See generally Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The error in this case, if any, was harmless beyond a reasonable doubt because the first life sentence must be served in its entirety without the possibility of probation or parole and, therefore, any additional term of years of imprisonment is mere surplusage. *See State v. Williams*, 860 S.W.2d 364, 367 (Mo.App. E.D.1993) (adding persistent sexual offender enhancement of "not less than 30 years" to life sentence was harmless error where defendant was required already to serve 40 years of the life sentence). Greer will be in prison for the rest of his life, and that would be true whether these sentences were run concurrently or consecutively.

Point denied.

### III. CONCLUSION

The judgment is affirmed.

WILLIAM H. CRANDALL, JR. J. and MARY K. HOFF, J. concurring.