

# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | WD81233 |
| | ) | |
| v. | ) | OPINION FILED: April 30, 2019 |
| | ) | |
| TEDDY CHARLES HAMMER, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Saline County, Missouri**
The Honorable Dennis A. Rolf, Judge

Before Special Division: Edward R. Ardini, Jr., Presiding Judge, Mark D. Pfeiffer, Judge
and Gary D. Witt, Judge

Appellant, Teddy Hammer ("Hammer"), was charged in Saline County with two counts of sexual misconduct involving a child less than 15 years of age. Prior to trial Hammer signed a deferred prosecution agreement under which the State would not prosecute Hammer but under which Hammer admitted his guilt to certain offenses and provided that, should Hammer fail to comply with the terms of the agreement, he waived his right to certain defenses at any future trial. Following the State's determination that Hammer was not compliant with the terms of the agreement, the State refiled the charges and the case proceeded to trial. A jury found Hammer guilty of one count of sexual

misconduct involving a child by indecent exposure and one count of sexual misconduct in the second degree.  The court sentenced Hammer as a prior and persistent offender to seven years in the Department of Corrections and six months in the county jail on the two charges respectively.  In his sole point on appeal, Hammer alleges that the court erred in enforcing the deferred prosecution agreement and prohibiting him from offering evidence to support the defenses of mental disease or defect or diminished capacity at trial.  We affirm.

## Factual Background

On July 10, 2012, Hammer, a 52-year-old male, was living in an apartment complex in Slater, Missouri.  All the alleged victims in this crime were other residents of the apartment complex.  E.L.[1] testified that around 9:30 p.m. her entire family was in bed asleep, when E.L. believed she heard a knocking sound.  Her three-year-old daughter, B.L, came to E.L. and said "Mom, Ted's knocking on my window."  E.L. then heard a loud knock at the front door.  They opened the front door and found Hammer standing at the door, nude.  B.L. was standing next to her mother.  Hammer was touching his genitals, shaking them toward B.L. but he was not masturbating.  Hammer said nothing.  C.L., E.L.'s husband, told Hammer, "I'm calling the police; you need to go home."  Hammer ran off screaming and C.L. shut the door.

On that same night, A.R. was at her older sister's apartment with her younger brother.  Also at approximately 9:30 p.m., Hammer opened the unlocked door of the apartment without knocking and stood in the doorway.  Hammer was nude and they saw

---

[1] We refer to the victims and family members by their initials to protect the victim's identities pursuant to section 595.226.

2

his genitals. He was not touching his genitals but "sort of thrust his hips out towards [them.]" A.R. threw a pillow at him and her sister yelled at him to get out. Hammer looked startled and shaken and started backing out of the doorway after about a minute. When he backed out, A.R.'s sister shut the door.

Between 9:30 p.m. and 10:00 p.m. on that same night, A.C. heard a knock on her apartment door and opened it to see Hammer standing at the door naked. He said he wanted to talk. He was not touching himself. A.C. slammed the door and called 911.

The State indicted Hammer with two counts of sexual misconduct involving a child less than 15 years of age. Hammer was appointed counsel ("Pre-Trial Counsel"). As will be discussed more fully below, Hammer has a seizure disorder and extremely low IQ which called into question his ability to understand his actions or that he was competent to stand trial. Hammer was evaluated and found to be incompetent to stand trial. By February of 2015, he was determined to have been restored to a sufficient level of competency to stand trial. Pre-Trial Counsel sought from the State a deferred prosecution agreement. The State drafted an agreement which Pre-Trial Counsel edited ("Agreement"). On May 10, 2016, Hammer was under the guardianship of his daughter, Whitney Fuller ("Fuller"), and residing at Northwest Psychiatric Rehabilitation Center. On this date, Pre-Trial Counsel presented the Agreement to both Hammer and Fuller.

The Agreement had several requirements including that Hammer must reside either at Northwest Psychiatric Rehabilitation Center or Lakeview Health Care and Rehabilitation Center in Boonville for the duration of the Agreement, which by its terms expired on December 31, 2019. Hammer was required to admit that the State's evidence established

3

beyond a reasonable doubt that he committed the crimes charged, and that this admission could be used to prove his guilt at a criminal trial if he violated the terms of the Agreement. It also required that Hammer stipulate to the admission of the Agreement as "conclusive proof" that he committed the crimes listed, and that he understood that the statement alone may constitute all the evidence presented on behalf of the State at any future trial. Additionally, the Agreement stated that Hammer acknowledged that:

> I intentionally, knowingly, willingly, and freely waive any defense based upon a mental disease or defect, diminished capacity, statute of limitations or any limitation of action or other defenses arising out of the dismissal of my pending case or that I may have to the re-filing of these charges during the term of this Agreement, or that I may have in the event this matter is tried after my failure to abide by the conditions set out herein. . . .

The range of punishment for which Hammer might be imprisoned should he violate the Agreement, up to seven years on each count, was clearly stated. Additionally, the Agreement clearly indicated that Hammer was voluntarily entering into the Agreement and was not required to accept its terms. After the Agreement was executed the State dismissed the charges against Hammer.

On July 15, 2016, the State determined that Hammer had failed to conform to the Agreement's terms and the State refiled the charges. Hammer was appointed new counsel who filed a motion *in limine* seeking to prohibit the State from using the Agreement in Hammer's trial and seeking to admit evidence of a diminished capacity defense. The trial court heard evidence and argument on the motion *in limine* on April 13, 2017 ("Motion Hearing").

4

Hammer called Dr. Timothy Leonberger ("Dr. Leonberger") to testify at the Motion Hearing. He testified that Hammer had a "very well-documented" seizure disorder. He was diagnosed with major neurocognitive disorders, due to multiple conditions, those being his seizure disorder and a frontal lobe dysfunction. His seizure disorder results in cognitive impairment and postictal confusion that can last hours or days following a seizure, especially if the seizures are not well-controlled. In such a state, Hammer appears dazed and confused, unaware of his surroundings, may beat on his chest, and talk nonsense. According to Dr. Leonberger, Hammer was in a confused postictal state due to a recent seizure at the time of the events giving rise to the criminal charges.

In regard to the Agreement, Dr. Leonberger testified that Hammer had "a number of deficits in cognitive functioning." Hammer's verbal and language abilities were in the lower one percentile of functioning. Hammer's IQ is 67 which is in the extremely low range. His working memory index was also in the extremely low range. Ultimately, it was Dr. Leonberger's opinion that Hammer would not have been able to understand the Agreement because he lacked "the language skills, the concentration, or the memory to understand [the Agreement] even if it was explained to him in as simple terms as possible." It was Dr. Leonberger's position that Hammer was competent to stand trial but he was not competent to have understood and signed the Agreement.

However, on cross examination, Dr. Leonberger admitted that Hammer would have understood the majority of the key words in the Agreement. He also believed Hammer understood the doctor's testimony at the hearing, that Hammer understood the nature and purpose of the medical evaluation as well as the limits of confidentiality but would not be

able to explain the medical concepts in the testimony using the same terms that Dr. Leonberger has used. He believed Hammer was restored to competency prior to signing the Agreement, he remained competent to stand trial at the time of the Motion Hearing, and that he would be able to assist his counsel with a diminished capacity defense. It was his opinion that Hammer would be competent to waive a jury trial at the time of the Motion Hearing and that Hammer would be capable of asserting his own will in the case if his attorney wanted him to do something in the case that Hammer did not want to do. Dr. Leonberger did not interview Fuller or Pre-Trial Counsel in reaching his opinions.

Pre-Trial Counsel testified at the Motion Hearing that she would not have had a client sign an agreement like the one signed by Hammer if she did not believe that her client understood and agreed to its terms. She spoke with Hammer and Hammer's guardian, Fuller, about the Agreement before each of them signed it. The exact nature of her discussions with Hammer or Fuller, however, were not disclosed because of attorney-client privilege. From the very beginning of her negotiations with the State, the Agreement was contingent upon waiver of any mental disease or defect or a diminished capacity defense and that was an integral term of the Agreement.

Fuller testified at the Hearing that she did not talk to Pre-Trial Counsel about the Agreement, nor did she have time to read it before she and Hammer signed it. She "figured it was just something to get him out of jail faster" and did not realize that he would be admitting guilt to the offenses. She testified that had she known the terms of the Agreement she would not have signed and would not have allowed Hammer to sign it. On cross-examination, however, Fuller was more equivocal saying that she "proofread" the

6

Agreement, did ask questions of Pre-Trial Counsel, and understood that there was some "give and take" in signing the Agreement.

The trial court noted that either the Agreement was valid or Pre-Trial Counsel was incompetent for allowing a client that was unable to understand its terms to sign the Agreement. Further, the trial court specifically stated that Dr. Leonberger's testimony "just doesn't make sense to me." Noting that it did not make sense that Dr. Leonberger believed Hammer could not understand the terms of the Agreement and yet was competent to assist counsel at trial because, in the court's opinion, trial assistance required a greater amount of competency than understanding the Agreement. The trial court denied Hammer's motion *in limine* to void the Agreement. The trial court also ordered that Hammer be reevaluated under section 552.020 to confirm his competency to stand trial.

Hammer was again determined to be competent to stand trial. Pursuant to the Agreement, the court excluded any evidence of Hammer's mental incapacity or diminished capacity. The State proceeded to prove its case at trial without relying on the admission of guilt in the Agreement. Following the close of all of the evidence, Defense counsel sought to make an offer of proof of the evidence they would have presented regarding diminished capacity. The court ruled that because counsel did not attempt to admit the evidence during trial and the evidence was already concluded in the trial, the offer of proof was untimely. Defense counsel noted that procedurally the offer of proof had not been made prior to the close of evidence because the State had not introduced the Agreement and there was the desire to "help move things along." Also, counsel contended that the offer of proof was mentioned to the court during a bench conference and it was counsel's understanding that

7

it would be addressed at a later time. Ultimately, the court heard the offer of proof in the courtroom while the jury deliberations proceeded in the jury room.

The jury found Hammer guilty on one count of felony sexual misconduct involving a child under the age of 15 and one count of the lesser included offense of misdemeanor sexual misconduct in the second degree. This appeal followed.

## Standard of Review

Hammer contends that because the waiver of constitutional rights are at issue, we should review the trial court's ruling *de novo*. *See State v. Pennington*, 408 S.W.3d 780, 784 (Mo. App. W.D. 2013). However, in *Pennington*, the issue was whether the lower court had applied the proper legal standard in upholding the waiver of *Miranda*[2] rights, not the validity of such a waiver. When examining the validity of a waiver of Constitutional rights the question is one of fact and "we will not overturn the trial court's finding unless it is clearly erroneous." *State v. Sparkling*, 363 S.W.3d 46, 51 (Mo. App. W.D. 2011); *Woods v. State*, 176 S.W.3d 711, 712 (Mo. banc 2005). We defer to the trial court on credibility issues and conflicts in the evidence. *Sparkling*, 363 S.W.3d at 51. The trial court's rulings are only clearly erroneous if, after a review of the entire record, this Court is left with the definite and firm impression that a mistake has been made. *Woods*, 176 S.W.3d at 712.

The State, however, argues that the question of whether the trial court properly excluded evidence of Hammer's diminished capacity is not preserved for appeal and should be subject to plain error review. In his motion *in limine*, Hammer sought to exclude all

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

8

evidence of the Agreement and further requested the trial court allow evidence of Hammer's mental health as part of his defense. The trial court denied the motion *in limine* but the State never attempted to place the Agreement into evidence or rely on any of its terms in presenting its case. Because the State never admitted the Agreement, the defense did not raise an objection to the Agreement or the inability to raise a diminished capacity defense during the evidentiary phase of trial.

A court's ruling on a motion *in limine* preserves nothing for appeal. *State v. Purlee*, 839 S.W.2d 584, 592 (Mo. banc 1992); *State v. Mickle*, 164 S.W.3d 33, 55 (Mo. App. W.D. 2005). "To preserve the matter for appeal, the proponent of the evidence must attempt to present the excluded evidence at trial, and if an objection to the proposed evidence is raised and sustained, the proponent must then make an offer of proof." *State v. Marshall*, 131 S.W.3d 375, 377 (Mo. App. E.D. 2004). Hammer only sought an offer of proof regarding evidence of Hammer's incompetency or diminished capacity after the close of evidence. While the court did ultimately hear the offer of proof, it was done after the close of evidence while the jury deliberated.

The issue that the parties present to this Court is the validity of the Agreement and more particularly the effectiveness of Hammer's waiver of a diminished capacity defense within that Agreement. This issue was fully presented to the trial court at the Motion Hearing. We find that even applying the more generous standard of review of clearly erroneous, applied to preserved claims of error, Hammer is not entitled to relief.

**Analysis**

Hammer's sole point on appeal alleges that the trial court erred in precluding evidence of his diminished capacity at trial because it was a violation of his constitutional right to present a defense and the Agreement which waived his right to present this defense is unenforceable because it was not a knowing, intelligent and voluntary waiver of that right. While Hammer frames the question before us as an evidentiary ruling, it is more precisely a challenge to the validity of the Agreement, specifically in regards to the Agreement's provision waiving Hammer's ability to present evidence to the jury supporting a diminished capacity defense. The parties agree that if the Agreement is valid, then the evidence of Hammer's diminished capacity was properly excluded.

In support of his argument regarding his ability to waive a diminished capacity defense in the Agreement, Hammer argues that: "In Missouri, there is a presumption that '[a] contract made with the purpose and upon the consideration that a criminal prosecution shall be suppressed, stifled or stayed will not be enforced.'" However, the cases relied on by Hammer for this proposition were not addressing deferred prosecution agreements but rather contracts between private parties to avoid prosecution through the payment of civil damages. *See generally, Y.W. By & Through Smith v. Nat'l Super Mkts, Inc.*, 876 S.W.2d 785, 789-90 (Mo. App. E.D. 1994) ("a private citizen or entity may not contract away his/her right to press criminal charges against the perpetrator of a crime"); *Ensminger v. Burton*, 805 S.W.2d 207, 217 (Mo. App. W.D. 1991). There is no presumption that a deferred prosecution agreement between a prosecutor and an accused is unenforceable and in fact there is no prohibition on this type of agreement by rule, statute or caselaw. Instead,

10

courts accept that a party may waive a right, even a constitutional right, in a deferred prosecution agreement so long as the waiver is knowing, voluntary and intelligent. *See generally*, *State v. Driskill*, 459 S.W.3d 412, 427 (Mo. banc 2015) (defendant was free to waive his constitutional right to testify if it was knowing and voluntary); *State v. Freeman*, 189 S.W.3d 605, 609 (Mo. App. W.D. 2006) (a criminal defendant may waive his constitutional right to a jury trial if it is voluntarily, knowingly, and intelligently made); *State v. Gray*, 100 S.W.3d 881, 886 (Mo. App. S.D. 2003) (adolescent could voluntarily waive constitutional right to remain silent so long as he made an intelligent, understanding, and voluntary waiver); *Cross v. State*, 359 S.W.3d 571, 576-77 (Mo. App. E.D. 2012) (a movant may waive his right to seek post-conviction relief in return for a reduced sentence so long as the waiver was made knowingly, voluntarily and intelligently). The United States Supreme Court has noted that such agreements are enforceable so long as the court considers whether the agreement is: (1) voluntary; (2) there is no allegation of prosecutorial misconduct; and (3) enforcement will not affect relevant public interests. *Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987) (agreement to waive right to civil suit in exchange for dismissal of criminal charges); *Coughlen v. Coots*, 5 F.3d 970, 974 (6th Cir. 1993).

While Hammer contends that "no reasonable person" could describe Hammer's waiver of his rights under the Agreement as voluntary, this argument is not supported by the evidence. Dr. Leonberger testified that Hammer did understand the words "intentionally," "knowingly," and "willingly" which were important in understanding what acts he was admitting to in the Agreement. Dr. Leonberger stated that Hammer understood the word "defense" and that the term "diminished capacity" could be explained to him.

11

While ultimately Dr. Leonberger testified that, in his opinion, Hammer could not have understood the terms of the Agreement, the trial court found that this testimony was incompatible with Dr. Leonberger's opinion that Hammer was competent to stand trial and properly assist in his defense. The court found that "the standard is higher to be able to assist in trial than it would be to go through a written document that is, what, three pages long and to be able to understand that when there is more time to take in and evaluate and have explained to you what a document says as opposed to the fast pace of trial."

Additionally, at the time that Hammer signed the Agreement he was represented by Pre-Trial Counsel. Pre-Trial Counsel specifically stated that she would not have allowed a client to sign a deferred prosecution agreement if she did not believe that the client understood the agreement. At oral argument, Hammer alleged that the trial court gave too much weight to Pre-Trial Counsel's determination of competency. At the Motion Hearing the trial court noted that either the Agreement was valid or Pre-Trial Counsel was incompetent for allowing a client to sign the Agreement who was unable to understand its terms. Hammer contends that the trial court improperly ceded its determination of whether Hammer knowingly and voluntarily waived his rights to Pre-Trial counsel rather than the trial court making the decision itself. This only appears to be the case when the comment is read in isolation. The trial court also entered into its own lengthy questioning of Dr. Leonberger about the court's concern with what the court considered to be contradictory opinions--that Hammer could not understand the Agreement but could understand trial proceedings and assist in his defense. The trial court specifically questioned Dr. Leonberger regarding the Hammer's capabilities of understanding the Agreement at the

12

time it was signed. Further, the trial court specifically noted that it found Dr. Leonberger's testimony regarding competency difficult to harmonize because the court believed it required a greater capacity of understanding to participate in a trial than to understand the Agreement.

Although the trial court certainly considered Pre-Trial Counsel's evaluation of Hammer's ability to understand the Agreement in determining if this was a voluntary and knowing waiver, in the context of the Motion Hearing as a whole, it is clear that the trial court independently considered Hammer's ability to knowingly and voluntarily consent to the terms of the Agreement and found he had done so. Given the totality of the Motion Hearing, we do not find that the trial court ceded its decision as to the voluntary and knowing nature of Hammer's waiver to Pre-Trial Counsel.

Finally, we note that the Agreement was not only signed by Hammer but by his appointed guardian and daughter, Fuller. Although Fuller initially testified that she neither read nor discussed the Agreement with an attorney, she admitted on cross-examination that she "proofread" the Agreement, did ask Pre-Trial Counsel questions, and understood that there was some "give and take" in the Agreement. Pre-Trial Counsel also testified that she did in fact talk with Fuller prior to her execution of the Agreement, although the content of the conversation was protected by attorney-client privilege. The trial court was free to disbelieve Fuller's testimony either that she did not read the Agreement or that she did not speak with Pre-Trial Counsel about its terms prior to signing. *State v. Delacruz*, 977 S.W.2d 95, 98 (Mo. App. S.D. 1998) ("credibility of witnesses and the weight to be given

13

their testimony was a matter for the trial court, which was free to believe none, part, or all of any witness's testimony").

It is clear that there was sufficient evidence upon which the circuit court could have found the Agreement was voluntarily and knowingly executed and Hammer's waiver of the defense of diminished capacity was valid. Applying the other two factors in *Rumery*, there is no allegation that there was prosecutorial misconduct or that enforcement of the Agreement would adversely affect the public interests.

The trial court's finding that the Agreement was voluntarily and knowingly entered into was supported by substantial evidence and there was no clear error in the trial court's decision to enforce the terms of the Agreement and more particularly the waiver of a diminished capacity defense at Hammer's trial.

## Conclusion

For the reasons stated above, we affirm.

_____
Gary D. Witt, Judge

All concur

14